```
                                                                    3
      UNITED STATES DEPARTMENT OF HEALTH              APPEARANCES
            AND HUMAN SERVICES
                                                MEMBERS OF THE BOARD:

    PROVIDER REIMBURSEMENT REVIEW BOARD          SUZANNE COCHRAN, CHAIRMAN
                                                 MARTIN W. HOOVER, JR.
                                                 ELAINE C. POWELL, CPA
  IN THE MATTER OF:                              DR. GARY BLODGETT

  ASHTABULA COUNTY MEDICAL   99-2234             BOARD ADVISOR:
                             00-2367
  COMMUNITY HOSPITAL         02-0636             K. GOODMAN
                             03-0289
                             04-0009             FOR PROVIDER:
  AKRON GENERAL              00-1306
                             99-1142             ALBERT J. LUCAS
  LIMA MEMORIAL              01-1143
                             02-0894             FOR INTERMEDIARY:
                             02-2099
                             03-0021             BERNARD TALBERT
  TOLEDO HOSPITAL            00-3419
                             00-3420
                             00-3421
                             00-3422
                             00-3423
                             99-2126

  VS.

  ADMINISTAR FEDERAL BLUE CROSS, BLUE
  SHIELD ASSOCIATION
```

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

```
                                          2                               4
                                                    CONTENTS

                                                WITNESS         DIRECT  CROSS
                                                REDIRECT  RECROSS  COURT

                                                FOR THE PROVIDER:

        TRANSCRIPT OF PROCEEDINGS              Charles Cataline    77     91
                                                  122    109

                                                FOR THE INTERMEDIARY:
              OCTOBER 7, 2004
              9:00 A.M.                         [None]
              SUITE 1
              2520 OLD LORD                     EXHIBITS                MARKED
              BALTIMORE DRIVE                   ADMITTED
              BALTIMORE, MARYLAND
                                                FOR THE PROVIDER:

                                                P-1 through P-14         8
                                                15
                                                P-15 through P-18       14
                                                15
                                                P-19                    25
                                                P-26                    14
                                                15
                                                P-27 Charles Cataline CV 9
                                                15
```

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

EXHIBIT B

5

FOR THE INTERMEDIARY:

I-1 through I-10                15
15

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

6

PROCEEDINGS
October 7, 2004

THE CHAIRMAN:
I call to order various PRRB case numbers that will be listed and attached to this hearing. It involves 17 Ohio Providers and the Intermediary, Administar Federal Blue Cross, Blue Shield Association. This hearing has been scheduled to resolve a dispute between the Provider and the Intermediary. The authority for this hearing is found under Section 1878 of Title 18 of the Social Security Act and the regulations at 42 CFR Sections 405.1801 to 405.1889. Statutory and regulatory provisions regarding the disclosure of information apply to the Board hearing process and to persons

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

7

participating in the process. The hearing record is discloseable to the public, unless there has been a duly-authorized claim of privilege or confidentiality approved by the Board. Although Board hearings are in the form of adversary proceedings, they are not restricted by formal rules of judicial procedure or evidence. Board procedures are intended to allow the full presentation of the facts which underlie disputes. The order in which evidence and argument shall be presented, the admissibility of the evidence, and the conduct of this hearing shall be at the sole discretion of the Board. The issues, the issue in this case has been stated by the parties as whether the

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

8

Intermediary improperly excluded patient days related to Ohio's Hospital Care Assistance Program referred to as HCAP, H-C-A-P, in the Provider's Medicare disproportionate share calculation. Does that correctly state the issues, Mr. Lucas?

MR. LUCAS:
Yes, it does. Let me just make one small correction.

THE CHAIRMAN:
Sure.

MR. LUCAS:
It's Hospital Care Assurance Program, not Assistance Program.

THE CHAIRMAN:
Oh. All right.

MR. LUCAS:
Although that is not an important distinction here.

THE CHAIRMAN:

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

167

9

```
             All right.  Thank you for that
             clarification.  Mr. Talbert,
             is that your understanding of
             the issue?
MR. TALBERT:
             Yes, it is.
THE CHAIRMAN:
             All right.  And we have some
             exhibits that have been
             presented to the Board that I
             want to make clear on the
             record so we know exactly what
             we have before us.  We the
             Providers final position paper
             with Exhibits P-1 through
             P-13, and then we have a
             supplemental submission with
             Exhibit P-14.  Is that
             correct, Mr. Lucas?
MR. LUCAS:
             That is correct, Madam
             Chairman.  I also have in that
             case one more exhibit which
             we've marked this morning.
             We've marked it as Exhibit
```

10

```
             P-26, and the exhibit is a
             cirriculum vitae for Mr.
             Cataline.
THE CHAIRMAN:
             All right.  Now, just to make
             it clear we don't have Exhibit
             15 through 25...
MR. LUCAS:
             In that particular case...
THE CHAIRMAN:
             ...before the Board.
MR. LUCAS:
             ...that's correct.
THE CHAIRMAN:
             Oh.  Okay.
MR. LUCAS:
             We've submitted exhibits as
             part of the jurisdictional
             challenge and as well as part
             of the dual eligible issue,
             but that is as Mr. Talbert
             points out a separate case
             and...
THE CHAIRMAN:
             Okay.
```

11

```
MR. LUCAS:
             ...we'll have those as part of
             a separate record.
THE CHAIRMAN:
             Oh.  All right.  Maybe we
             should just make it clear at
             this point this case involves
             17 cases which have a common
             issue, and the parties have
             agreed that one of those cases
             will be presented as
             representative of all the
             cases involving what we refer
             to as the HCAP issues.  And
             those are the particular
             exhibits that we are referring
             to.  There are other cases,
             the other 16 cases may have
             different exhibit numbers.  Is
             that correct?  But they are
             -- it's still the...
MR. LUCAS:
             No.  I think what we intended
             to do, if Mr. Talbert agrees
             to this, is that we have
```

12

```
             proposed to take my Exhibits
             P-1 through P-14 and then P-26
             and have it as part of the
             record for all 17 of the HCAP
             cases.
THE CHAIRMAN:
             Okay.
MR. LUCAS:
             Then there are two other
             matters that the Board is
             going to either hear today or
             decide at some point; one
             relating to a jurisdictional
             challenge for Akron General in
             1995, and not involving any
             other hospital or any other
             year, and there's also a
             question of whether or not
             there are dual eligible
             Medicare benefits exhausted
             days that should be allowed.
             That's part of Ashtabula
             Hospital, 1996, I believe that
             is, and that has, as well, a
             separate position paper and a
```

168

13

1  separate exhibit. That
2  exhibit number is P-26.
3  THE CHAIRMAN:
4      Now, Ashtabula has -- we have
5      P-26 in this case, but
6      Ashtabula also has a P-26?
7  MR. LUCAS:
8      We do not have a P-26 in this
9      case. If I said P-26, did I
10     say P-26?
11 THE CHAIRMAN:
12     Yes.
13 MR. LUCAS:
14     I'm sorry. It should have
15     been P-27.
16 THE CHAIRMAN:
17     Okay.
18 MR. LUCAS:
19     Mr. Talbert warned me that I
20     would do this, and of course,
21     I have.
22 THE CHAIRMAN:
23     That's the reason we go
24     through this at the beginning
25     so that when we start looking

14

1      at the case to make a
2      Decision, we know what
3      exhibits we have.
4  MR. LUCAS:
5      And I apologize.
6  THE CHAIRMAN:
7      It could be very confusing
8      sometimes, especially where we
9      have multiple cases.
10 MR. LUCAS:
11     So in the HCAP case involving
12     all 17 of the Providers, there
13     are Exhibits P-1 through P-14
14     and then P-27.
15 THE CHAIRMAN:
16     Okay.
17 MR. LUCAS:
18     In the jurisdictional
19     challenge there are exhibit
20     -- there's a separate brief
21     filed in opposition to the
22     jurisdictional challenge, and
23     there are Exhibits P-16, 17,
24     18, I thought there was a 19
25     as well. Yes. I'm sorry.

15

1      P-15, 16, 17, and 18. So
2      there are four exhibits for
3      the Provider in connection
4      with the jurisdictional
5      challenge. And then with
6      respect to the dual eligible
7      issue there is one exhibit,
8      P-26.
9  THE CHAIRMAN:
10     Okay. So we should not be
11     looking for any exhibits
12     labeled 19 through 25 in
13     connection with this case.
14 MR. LUCAS:
15     That's correct.
16 THE CHAIRMAN:
17     Okay. All right. Okay.
18     Thank you for that
19     clarification, and Mr.
20     Talbert, do you have any
21     objection to any of the
22     Provider's exhibits being
23     admitted into the record of
24     this case?
25 MR. TALBERT:

16

1      No.
2  THE CHAIRMAN:
3      Okay. Thank you. The
4      Intermediary, I'm sorry, the
5      Intermediary has filed
6      position paper with Exhibits
7      I-1 through I-6, and they
8      presented since that time
9      additional Exhibits I-7
10     through I-10. Is that
11     correct?
12 MR. TALBERT:
13     That is correct.
14 THE CHAIRMAN:
15     Okay. Mr. Lucas, do you have
16     any objections to those
17     exhibits being admitted into
18     the record of this case?
19 MR. LUCAS:
20     I do not.
21 THE CHAIRMAN:
22     Okay. Those will be admitted.
23     All right. The parties I
24     believe are going to clarify
25     perhaps some of the issues in

17

        your opening statement about
        the way these are being
        presented, so Mr. Lucas, go
        ahead.
MR. LUCAS:
        Why don't we just start with
        the preliminary matters as to
        the different issues we have,
        and then I'll get into my
        opening statement on HCAP. As
        I understand it, as I
        indicated earlier, there is
        three issues. One of the
        issues is HCAP, which I will
        address last in this
        presentation. The other
        issues involve a
        jurisdictional challenge for
        Akron General '95, 1995, and a
        dual eligible issue involving
        Ashtabula, 1996. With respect
        to the jurisdictional issue, a
        couple of things I want it
        stipulated to on the record,
        we have filed a Provider's

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

18

        opposition to Intermediary's
        jurisdictional challenge and
        have Exhibits P-15 through
        P-18 as part of that. And we
        would ask that that brief and
        those exhibits be accepted
        into the record.
THE CHAIRMAN:
        Okay. Those will be received
        into the record.
MR. LUCAS:
        Okay. With respect to the
        jurisdictional challenge, I've
        set forth our position in the
        brief, but let me just give
        you a two-minute summary of
        what our position is. There
        are two matters that the
        Intermediary raised as to a
        jurisdictional challenge for
        Akron General. One related to
        the calculation of the DSH
        days, and it involved two
        things; one, the
        Medicaid-eligible days and

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

19

        two, the HCAP days. What the
        Provider has agreed -- what
        the Intermediary has agreed to
        do is to withdraw the issue on
        the jurisdictional challenge.
        The Provider believes that
        there is jurisdiction over the
        DSH issue for the reasons set
        forth in our brief. It was a
        classic case of
        self-disallowance. There was
        a regulation in effect that
        prohibited the Provider from
        including costs relating to
        Medicaid-eligible days and
        HCAP days, and on account of
        that, the Provider was not
        able to meet the DSH
        threshold, and therefore, did
        not include DSH in the cost
        report. However, subsequent
        to that the Provider has
        appealed the issue, and with
        the addition of the
        Medicaid-eligible days and

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

20

        ultimately, hopefully the HCAP
        days, the Provider does
        qualify for DSH. So it is a
        classic self-disallowance
        situation. The Bethesda case
        that's cited in our brief it's
        clear that the Bethesda case
        is on point in all respects
        here, and we would ask that
        the jurisdictional challenge
        be overturned or denied based
        upon the Bethesda case and the
        facts with respect to that.
        The other jurisdictional
        challenge relates to -- let me
        take one step back. Also with
        respect to the DSH-eligible
        days, that information has
        already been presented to the
        Intermediary, it's been
        reviewed by the Intermediary,
        and the Intermediary has
        agreed in the administrative
        adjustment report, in the
        administrative settlement to a

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

21

particular number of days that will be allowed under the Medicaid-eligible category, if, in fact, the Board accepts jurisdiction. I don't have that number off hand. Do we know what it is? Okay. But that there is an agreement as to the number of days, and I would just like to have a stipulation that if the Board accepts jurisdiction, that the days that are set forth in the proposed AR and signed AR will be allowed for purposes of Medicaid DSH.

THE CHAIRMAN:
    Okay. Do you want to address that now, Mr. Talbert?

MR. TALBERT:
    Yeah. Again, there are -- there's jurisdictional challenges to two issues and from a legal perspective they're sort of opposite poles

22

of what looks like the same problem. As far as the addition of the DSH-eligible days and the HCAP days for this one hospital, the adjustment was originally challenged on kind of a classic, no adjustment, no claim. Upon further review, you know, we agree with Mr. Lucas that this, the DSH component has the classic elements of a self-disallowance, and we have advised the Board that we requested leave to withdraw the jurisdictional challenge. So I guess you can either rule it so withdrawn or just make a finding that there is jurisdiction, or I guess if you disagree with both of us on that issue, I guess you have the option to make a finding that there's no

23

jurisdiction. On the cafeteria issue our position is, and it's consistent with a number of administrator review Board Decisions and one Summit Circuit case, I won't go through the details now, that that's not a futile Claim. It wasn't a self-disallowance. You can put whatever label you want on it, an oversight, but it was an attempt well after the cost report was filed and well after the reopening period had lapsed to change some, to correct an error in the filing. And we don't believe that's an appropriate issue to raise through an Appeal. And we ask for a ruling on that. What I have in my hand, and we can mark it as an exhibit, although I'm not sure which exhibit it would be for this case, is a

24

narrative explanation of what the problem is, and it indicates that the parties agreed to the bottom line. So if this case, if this issue goes according to form, we -- if the Board will reject it for jurisdiction and it's up to the Provider to pursue it, or the Board by ruling in the Provider's favor will inherently assume jurisdiction, and then we will have a final PRRB Decision that we can take to the administrator for further review. So I guess this is half housekeeping, but I need to mark the write-up with what the Provider representatives have seen and make this part of the record in the Akron '95, case.

THE CHAIRMAN:
    Okay. That's -- you have seen

171

25

```
 1            that and...
 2  MR. TALBERT:
 3            I have.
 4  THE CHAIRMAN:
 5            ...you agree to it?  All
 6            right.  Why don't we just
 7            -- how's that labeled?
 8  MR. TALBERT:
 9            It's not labeled, because I
10            wasn't sure how to label it.
11  THE CHAIRMAN:
12            Can we just call it a
13            stipulation?
14  MR. TALBERT:
15            Pardon?
16  MR. LUCAS:
17            Sure.
18  MR. TALBERT:
19            It's not -- it's just a -- we
20            have -- it's just an
21            explanation of what the...
22  THE CHAIRMAN:
23            But it's something that the
24            parties agree on.
25  MR. TALBERT:
```

26

```
 1            Yeah.
 2  MR. LUCAS:
 3            Yes, we do, and I would
 4            propose that we just name it
 5            P-19, since we have already
 6            exhibits in that case.
 7  THE CHAIRMAN:
 8            Okay.  Will that work for you,
 9            Mr. Talbert?
10  MR. TALBERT:
11            Okay.  Want me to do that now
12            so I don't forget?
13  THE CHAIRMAN:
14            Let's do.
15  MR. TALBERT:
16            Yeah.
17  MR. LUCAS:
18            I'll just give them to Mr.
19            Goodman then, unless you want
20            them now.
21  THE CHAIRMAN:
22            I don't.  We don't need that
23            now...
24  MR. LUCAS:
25            I don't know why you'd want
```

27

```
 1            them.
 2  THE CHAIRMAN:
 3            ...I don't believe.  Yes.  If
 4            you'll just give it to Mr.
 5            Goodman...
 6  MR. LUCAS:
 7            I'll even ask him to...
 8  THE CHAIRMAN:
 9            ...he'll see that it's
10            properly...
11  MR. LUCAS:
12            ...write P-19...
13  THE CHAIRMAN:
14            ...labeled and part of the
15            record.
16  MR. LUCAS:
17            ...at the bottom.  Okay.
18  THE CHAIRMAN:
19            Okay.  Anything further on
20            jurisdiction, Mr. Talbert?
21  MR. TALBERT:
22            No.
23  THE CHAIRMAN:
24            Okay.  Go ahead, Mr. Lucas.
25  MR. LUCAS:
```

28

```
 1            I'd like to just continue on
 2            jurisdiction, because I
 3            haven't had a chance to
 4            address the cafeteria reclass
 5            issue.  I have talked about
 6            the DSH issue, and I've
 7            exhausted my argument there.
 8            On the cafeteria issue it is
 9            our position as we set forth
10            in the brief that the costs
11            were included for cafeteria
12            reclass in the cost report.
13            The Provider in the work
14            papers with the cost report
15            made a mathematical error.
16            Instead of adding a number to
17            the cafeteria reclass cost, in
18            fact, subtracted a number.
19            When the information was
20            reviewed by the Intermediary,
21            the Intermediary didn't catch
22            the mistake either.  So a
23            cafeteria reclass number was
24            agreed upon by the
25            Intermediary, but the number
```

29

1  was incorrect. We, when we
2  discovered the error, we went
3  ahead and filed an Appeal with
4  respect to it as part of the
5  proper,
6  jurisdictionally-proper Appeal
7  that was pending for Akron
8  General. So in our position
9  the costs were included in the
10 cost report, the Intermediary
11 did make a Determination as to
12 that cost. Obviously, the
13 Determination was erroneous.
14 It was erroneous from our
15 perspective and theirs, but we
16 think the Board has
17 jurisdiction over it because
18 of that. With respect to
19 jurisdiction, and I think that
20 exhausts the argument and
21 stipulations with respect to
22 that.
23 THE CHAIRMAN:
24     Okay. The Board will take
25 those jurisdictional arguments

30

1  under advisement.
2  MR. LUCAS:
3      Thank you. Let me now turn to
4  the dual eligible Medicare
5  benefits exhaustive issue. As
6  I indicated earlier, we had
7  submitted Medicaid-eligible
8  information to the
9  Intermediary some time ago.
10 Just a couple of weeks ago we
11 got notified that there were
12 some dual eligible Medicare
13 benefits exhausted, patient
14 days that the Intermediary was
15 not going to allow the
16 ostensible reason given by the
17 Intermediary was that the
18 Intermediary claimed that the
19 days were included in the SSI
20 percentage, and therefore,
21 shouldn't also be included as
22 part of the second portion of
23 the DSH calculation. We have
24 submitted a brief with respect
25 to that in the Ashtabula 1996,

31

1  case, and it addresses our
2  position. I think our
3  position could be stated quite
4  succinctly that the Federal
5  register very recently
6  indicated that the
7  Intermediary was going to
8  start including the Medicaid
9  eligible but -- excuse me.
10 Dual eligible but Medicare
11 benefits exhausted information
12 and patient days in the SSI
13 percentage, clearly indicating
14 that it had not been included
15 previously. So it's our
16 position that there is a
17 document on file in the
18 Federal register which makes
19 very clear that this -- these
20 dual-eligible days were not
21 included in the SSI percentage
22 and therefore, should be
23 included in the
24 Medicaid-eligible calculation.
25 And the Board obviously has

32

1  decided in the past that
2  dual-eligible Medicare
3  benefits exhausted days are to
4  be included in the
5  Medicaid-eligible portion of
6  the DSH calculation. With
7  respect to the documentation
8  on the dual-eligible issue,
9  again, that documentation has
10 been submitted to the
11 Intermediary. It's been
12 reviewed by the Intermediary.
13 I think the Intermediary has
14 agreed on the number. I don't
15 know exactly what that number
16 of days is, but we would
17 propose that if the Board
18 decides that there is
19 jurisdiction, that we just
20 have an agreement that the
21 days are as reflected in the
22 Intermediary's review as
23 agreed upon by the Provider.
24 THE CHAIRMAN:
25     Mr. Talbert, do you have

33

anything further on the
Dual-eligible issue?
MR. TALBERT:
    Yes. I just understand that
the problem has been on the
table. It was focused through
a supplemental position paper
for this Provider on this
issue about, I think it was
dated September 21, and it
keys off of a Federal register
change in the regulations that
was published in mid-August
and ties back to a proposed
change about a year before
that. I would say the word
clearly doesn't apply to
anything in that issue and
what we've requested, given
that the posture is new even
if the problem is old, that
we've requested no more than
30 days to state a position,
get a brief on file on whether
those days should be counted

34

or not or have been counted or
haven't and then you let the
Provider respond accordingly
and let that issue catch up
with the main issue for that
hospital rather than argue
that today.
THE CHAIRMAN:
    Okay. This is a matter that
we have discussed some prior
to going on the record, and
after this hearing we will
determine what, if any, extra
time might be needed to do
that and what the Board needs
on that. And we'll make a
Determination at that time.
MR. LUCAS:
    Madam Chairman, if I can ask a
question.
THE CHAIRMAN:
    Sure.
MR. LUCAS:
    If we get to the point with
the Intermediary where they

35

agree to allow these days to
be included, can we simply
notify the Board that we've
reached a resolution of that,
and therefore, we're going to
settle that matter?
THE CHAIRMAN:
    Oh, definitely. We invite
those anytime.
MR. LUCAS:
    Okay.
THE CHAIRMAN:
    Okay. Anything further on
jurisdiction, other issues
that you think we need to
address initially? Are we
ready to go to the HCAP issue?
MR. TALBERT:
    I'm ready to go to HCAP.
THE CHAIRMAN:
    All right. Mr. Lucas...
MR. LUCAS:
    Thank you very much.
THE CHAIRMAN:
    ...do you have an opening

36

statement?
MR. LUCAS:
    Members of the Board, as you
stated earlier, Madam
Chairman, the issue before the
Board is whether Ohio Hospital
Care Assurance days should be
included in the Federal
disproportionate share
calculation. To answer the
question, the Board need look
no further than the DSH
statute itself. In the DSH
statute, excuse me, Congress
has spoken clearly and
unambiguously on the issue,
and what Congress said -- I'm
sorry. I'm having problems
with breathing, and I
apologize for that. We've
talked before that there's a
virus going around.
THE CHAIRMAN:
    Do we need to take a short
break, Mr. Lucas?

37

MR. LUCAS:
No. I think I'm okay. Again, to answer the question, the Board need look no further than the disproportionate statute itself, because Congress has spoken clearly and unequivocally on the issue. And what Congress said in the disproportionate share statute is that the calculation should include patient days for patients which are eligible for medical assistance under a state plan approved under Title 19. The Ohio HCAP Program days clearly meet this requirement. Under the HCAP Program indigent care patients in Ohio are eligible for medical assistance. It is also clear on the record that under the Ohio HCAP Program it is part of the Ohio State Plan approved under 19. All of the

38

requirements of the DSH statute have been met, and we would submit to the Board that under the clear and unambiguous language of the DSH statute that Ohio HCAP days should be included in the disproportionate share calculation for all of the 17 Providers at issue in this case. I'd like to direct the Board's attention to the specific language in the disproportionate statute that's at issue in this case, and if the Board would like to look at it, it's part of the Provider's final position paper, and it can be found at Exhibit P-5. Specifically, P-5 has a number of pages in it. Page 9 is where the relevant language is. It's about a third of the way down the page, and it's prefixed by

39

what is marked as Roman numeral II. In this section of the disproportionate share statute, Congress is describing how to calculate the disproportionate patient percentage to determine whether a Provider is entitled to DSH. And in Roman numeral II, the Congress lays out the second part of the percentage, and I'll read into the record what it says under Roman II. It says that, "The disproportionate share -- patient percentage means with respect to a cost reporting period of a hospital, the sum of," and then Roman numeral I. "Roman numeral II says the fraction (expressed as a percentage), the numerator of which is the number of hospital patient days for such period which

40

consist of patients who (for such days) were eligible for medical assistance under a state plan approved under Title 19, but who are not entitled to benefits under part eight of this title, and the denominator of which is the total number of the hospital's patient days for such period." That's a lot of words, but the statute can be broken down quite simply, and the statute says and means that in calculating the disproportionate share percentage you include patient days for patients who are eligible for medical assistance under a state plan approved under Title 19. That's what it means, that's what it says. So the issue is whether the Ohio Hospital Care Assurance Program days meet

41

that requirement, and the answer in looking at the Ohio Hospital Care Assurance Program is clearly that program does meet the requirement. What is the Ohio Hospital Care Assurance Program? It is a program that provides medical assistance to indigent care patients in Ohio. Again, let me direct the Board's attention to the Ohio Hospital Care Assurance Program statute and the Ohio administrative rules or some of them relating to the statute. That can be found at Exhibit P-7 of the Provider's final position paper. The Ohio Hospital Care Assurance Program is codified at Ohio Revised Code, Section 5112, and the Ohio Administrative Code at Section 5101:3-2. As I mentioned earlier the Ohio

York Stenographic Services, Inc
34 North George St., York, PA 17401 · (717) 854-0077

42

Hospital Care Assurance Program provides medical assistance to indigent care patients in Ohio. Under the HCAP Program Ohio hospitals are required to provide hospital-level care for indigent care, indigent patients in Ohio. And the authority of that can be found at Section 5112.17 of the Ohio Revised Code. Again, that section is included in what's marked as P-7. That authority can also be found in the Ohio Administrative Code in the corresponding section to Sub-Section 17. Not only does the Ohio HCAP Program require that medical assistance be provided to indigent care patients, but the Ohio HCAP Program also outlines the type of services that will be provided by the Providers

York Stenographic Services, Inc
34 North George St., York, PA 17401 · (717) 854-0077

43

under the Program rules. And, again, those -- that information is set forth in Ohio Revised Code Section 5112.17 and the corresponding administrative code. In addition to requiring that hospitals provide hospital-level services to indigent care patients, the Ohio HCAP Program also provides a mechanism to reimburse hospitals for the costs of that program. The mechanism for doing that is set forth in Section 5112.08 of the Ohio Revised Code and the corresponding administrative rule. Finally, under the HCAP Program payments to hospitals are specifically conditioned upon the Provider giving the hospital-level care to the indigent care patients that is

York Stenographic Services, Inc
34 North George St., York, PA 17401 · (717) 854-0077

44

required by 5112.17. And the authority for that is contained in Section 5112.18 of the HCAP statute in the Ohio Revised Code. All of these requirements clearly indicate that the Ohio HCAP Program provides for medical assistance to indigent care patients in Ohio. The HCAP Program is funded on both the Federal and state level, and most importantly, the Ohio HCAP Program is today and has been for all relevant periods subject to this Appeal, part of the Ohio State Plan approved under Title 19. I have included as part of the record in this case in the Provider's supplemental position paper at Exhibit 14 documents which evidence the fact that the HCAP Program in Ohio has been part of and

York Stenographic Services, Inc
34 North George St., York, PA 17401 · (717) 854-0077

45

approved as part of the Ohio
State Plan under Title 19
during the period set forth in
the documentation.  Based upon
the foregoing, the evidence in
the record clearly shows that
Ohio HCAP days meet all of the
requirements for inclusion of
those days in the
disproportionate stare [sic]
statute, based upon the clear
and unambiguous mandate of the
DSH statute, HCAP days much
-- must be included in the
disproportionate share
calculation.  Let me briefly
address the arguments made by
the Intermediary in its
position paper.  The
Intermediary argues that the
Board should ignore the plain
and unambiguous mandate in the
disproportionate share statue
and should instead apply the
rules set forth in the

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

46

implementing regulation or in
HCFA ruling 97-2.  According
to the Intermediary, the
implementing regulation and
HCFA ruling 97-2, require that
under the disproportionate
share statute the only patient
days that can be included are
patients that qualify for
traditional Medicaid, as
opposed to the broader
definition contained in the
statute.  The Intermediary
argues that since the HCAP
Program doesn't involve
traditional Medicaid patients,
that those patient days should
not be included in the
disproportionate share
calculation, relying, again,
on the regulation and on the
HCFA ruling 97-2.  But the
Intermediary's argument fails
for two reasons.  The first
reason is that the Board has

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

47

already confronted this issue
and has already rejected the
argument in the Jersey Shore
case.  In Jersey Shore the
Board concluded that if
patients are eligible for
medical assistance under a
state plan approved under
Title 19, as the statute
specifies, then those patient
days are, in essence, Medicaid
days, because they were
included as part of the state
plan approved under Medicaid.
They're not traditional
Medicaid, but they are in
essence Medicaid days.  That's
very clear from the Jersey
Shore case, and the same
analysis applies here.  The
regulation according to the
Board in the Jersey Shore case
is not inconsistent with a
finding that the -- a program
which provides for patients

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

48

obtaining medical assistance
under a state plan or approved
under Title 19 that is not
traditional Medicaid should be
included in the
disproportionate share
calculation.  And the Board in
the Jersey Shore case made
that analysis.  So what the
Board decided in the Jersey
Shore case is that it's
consistent with the regulation
that's being cited to by the
Intermediary, and it's also
consistent with HCFA ruling
97-2 for a -- to have a
finding that a non-traditional
Medicaid patient day that
otherwise satisfies the
requirements of the statute,
that being that it's a patient
day which provides medical
assistance under a state plan
approved under Title 19.  If
those requirements are met,

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

49

that is, in effect, a Medicaid
day and should be allowed
under the disproportionate
share statute. But the
Intermediary's argument falls
for yet another reason. And
that is if the Intermediary
argues that the regulation
that they rely on and HCFA
ruling 97.2, means that the
DSH calculation should only
include traditional Medicaid
days, then the Intermediary is
arguing that the regulation
and the HCFA ruling should
trump the clear and
unambiguous provisions in the
statute. As I mentioned
earlier, the Federal statute
that outlines the
disproportionate share rules
clearly and unambiguously says
that what should be included
in the disproportionate share
calculation is patient days

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

50

for patients who are eligible
for medical assistance under a
state plan approved under
Title 19. That's the language
itself of the statute. A
regulation or rule cannot
contradict or unduly limit the
mandate of Congress as
expressed in the statute. In
our position papers we've
cited the Chevron Decision,
which outlines Federal law on
this subject. A -- where a
statute clearly and
unambiguously defines what
should be included and what
was the intent of Congress.
You can't pass a regulation
that contradicts it or unduly
limits it here. That is
precisely what the
Intermediary's arguing for the
Board to accept in this
particular case. Because if,
in fact, the regulation should

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

51

be interpreted as just
allowing tradition Medicaid
days, and if HCFA ruling 97.2
should do that, that those
regulations and that ruling
violates Federal law as set
forth in the Chevron Decision.
One more point on that
subject. If Congress had
wanted to limit what should be
included in the
disproportionate share
calculation to traditional
Medicaid days, it could have
easily said that. If you look
at the language in the
disproportionate share
statute, they could have said
that it should include patient
days for patients which are
eligible for medical
assistance under Title 19.
That would be clear that what
they were doing is limiting it
to traditional Medicaid days.

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

52

But that's not what Congress
said. What Congress said is
that you should include as
part of the disproportionate
share calculation patient days
for patients who are eligible
for medical assistance under a
state plan approved under
Title 19. It would have been
easy for Congress to say what
the Intermediary argues that
they were saying, but that's
not what Congress said. And
under basic statutory
construction, you can't ignore
a phrase that is as important
as, included in the state plan
or including under the state
plan. You have to take that
into account in deciding what
the intent of Congress is. So
we would submit to you, ladies
and gentlemen of the Board,
that it is very clear what
Congress intended here. They

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

53

    intended to include something
    more than traditional Medicaid
    patient days in the
    disproportionate share
    calculation.  What they
    intended to do is include as
    the statute says patient days
    for patients who are eligible
    for medical assistance under a
    state plan approved under
    Title 19.  The HCAP Program
    clearly meets those
    requirements, and HCAP Program
    days should be included in the
    disproportionate share
    calculation.  That ends my
    initial presentation.  We do
    have a witness as I've
    indicated earlier, Mr. Charles
    Cataline from the Ohio
    Hospital Association.  He's
    available by phone, and he
    will be testifying in support
    as well of our position.
THE CHAIRMAN:

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

54

    Okay.  Thank you, Mr. Lucas.
    Mr. Talbert, do you have an
    opening statement?
MR. TALBERT:
    Okay.  Thank you.  Good
    morning again.  We've looked
    at the same statutes and
    regulations as cited by the
    Provider in its position
    paper.  We've added some
    additional statutes in our
    supplemental exhibits that
    were filed in July and
    indicated the purpose of those
    statutes.  We look at the
    legislative construction and
    the administrative
    implementation as leading to a
    clear and unambiguous outcome,
    but it's the exact opposite
    outcome that the Provider is
    advocating.  And I'm going to
    walk through that.  To assist
    in our presentation I put
    together a package, which

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

55

    includes a good number of the
    references that Mr. Lucas
    made.  But what we've done is
    identify up at the top
    right-hand corner the source
    in the record and the page
    number and then in the bottom
    right, in the bottom left-hand
    corner just numbered them,
    numbered the various
    references sequentially so you
    can -- it made it a little bit
    easier for me to work with
    this case.  I'll leave it to
    your discretion whether you
    want to go back to the big
    books or this handout.  But,
    anyway, I think we agree on
    the framework.  The question
    again is whether days of
    inpatient care furnished
    pursuant to Ohio HCAP should
    be counted in the Medicaid
    proxy of the DSH calculation.
    And obviously, we'll be

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

56

    talking a little bit about the
    proxy, but we will assume that
    the Board has heard similar
    cases, understands the
    Medicaid proxy.  To the extent
    that it's heard similar cases,
    each one is in part dependent
    on the specific state program
    and how it works.  And we're
    actually looking at this
    because we don't see a
    complete administrative or
    judicial decision directly on
    point.  It's sort of a case of
    first impression.  Provider
    relies heavily on the Jersey
    Shore Decision, and we will
    discuss what that case said
    and what it didn't say and how
    it wound up at the end of our
    presentation.  And, again, in
    order to understand the issue,
    it is necessary to understand
    Ohio HCAP.  The workings of
    HCAP is primarily a matter of

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

57

integrating the statutes and the implementing regulations, and I think after you listen to the explanation from the parties and review it yourself, I think you'll get a pretty good -- I think we're pretty much agreed upon how it works. We do have a Mr. Tom Voytko from Administar, the Intermediary, available if there are some questions that we need to put on about the program through evidentiary testimony. I think that will depend upon what we hear from the Provider's witness. And again, the HCAP legislation is Provider Exhibit 7, and then the Intermediary has its Exhibit 4, one part of the implementing, I guess we'd call it state regulation, which is most central to the controversy. And I guess

58

probably the best place to begin is as -- where Mr. Lucas began, section of the statute of the Ohio Revised Code, 5112.17. It's in Provider Exhibit 7, and it is -- let me find it. At page 8 of our handout, and it puts this obligation on Ohio hospitals, along with other burdens and benefits. Each hospital that receives funds distributed under Sections 511.201 to 5112.21 of the Revised Code shall provide without charge to the individuals basic, medically-necessary hospital-level services to individuals who are residents of the state, are not recipients of the medical assistance program, and we'll -- that's a critical term, and whose income is at or below the poverty guideline. I

59

think that's the relevant part of that piece of the statute. A couple comments maybe for further reference. We view, the Intermediary views medical assistance as the class of individuals who qualify and receive Medicaid. Throughout our presentation, throughout the record you will see that medical assistance and Medicaid or traditional Medicaid as Mr. Lucas referred to it, are synonymous terms. The HCAP focuses on patients who are not eligible for medical assistance, that based on another measure are indigent and receive and are eligible to receive care without having to pay for it. So we want to keep those -- we're going to use the term medical assistance or Medicaid patients separate from

60

indigent patients. We're going to use indigence to describe the HCAP patients, and they're different, and they're different all through any legal authority you want to look at. Surrounding the obligation to provide coverage free of care to indigents who do not qualify for medial assistance is a levy or a tax on hospitals. I think you can see the workings at 5112.01 and 5112.06, which we have in P-7 in pages 3 and 4 of our handout, the -- kind of the collection and the distribution. And the way we understand the collection works and if there's -- if the HCAP representative disagrees with us, I'm sure we'll hear from that, but pursuant under the state Medicaid Program there is something

61

1  effectively, a cost report,
2  and the key number are the
3  total facility costs less
4  costs associated with -- might
5  be hospital-based skilled
6  nursing facility. So there is
7  an assessment based on the
8  total cost of running a
9  hospital. That assessment is
10 taken, and it is put into a
11 pool and in addition to
12 Federal matching for the HCAP
13 distributions back to the
14 hospital, but it's put
15 together, and it's allocated
16 back to the participating
17 hospitals on a formula which
18 in large part represent each
19 hospital's provision of care
20 under the free care for the
21 not-Medicare eligibles in
22 relation to the total pool and
23 then distributes the
24 assessments collected, any
25 interest earned, and the

62

1  Federal matching back to the
2  hospitals basically in
3  proportion to the amount of
4  HCAP care they provided. So I
5  think that's I think a pretty
6  good and accurate, if fairly
7  simplified, version of the
8  three elements of HCAP. Whose
9  care is at issue, where are
10 the funds come from, and how
11 they're collected, and how the
12 funds are distributed back.
13 So I want to go back to the
14 Provider's argument concerning
15 the disconnection between the
16 Federal, the Medicaid proxy in
17 the statute and the Medicaid
18 proxy in the regulation. And,
19 again, Mr. Lucas read it. I'm
20 going to make you listen to it
21 again. It's kind of a mouth
22 full. It's -- I think it's at
23 page 9 of our handout. It's
24 1886D5F little Roman numeral
25 vi, small 2. Again, the

63

1  fraction expressed as a
2  percentage of the numerator of
3  which is the number of the
4  hospital's inpatient days for
5  such period which consist of
6  patients who for such days
7  were eligible for medical
8  assistance under a state plan
9  approved under Title 19. And
10 we're going to keep hammering
11 on the fact that those words
12 have got to be read together.
13 There's no break in them.
14 Days for patients who are
15 eligible for medical
16 assistance under a state plan
17 approved under Title 19. What
18 does the regulation say? The
19 regulation says the number of
20 patient days for which
21 patients were eligible for
22 Medicaid. Then there's a
23 qualifier in both that they
24 not be eligible for Part A,
25 but we're just going to say

64

1  the statute says medical
2  assistance under a state plan
3  approved under Title 19. The
4  regulation says eligible for
5  Medicaid. Again, the key part
6  of the Provider's case is that
7  the statute and the reg are
8  talking about two different
9  things, that the statute has
10 brought the regulation
11 unfairly limits or cuts out a
12 class of days, a position we
13 vehemently disagree with.
14 Medical assistance as used in
15 the statutory proxy is not a
16 generic term for the
17 financially needy. It is
18 -- has a very specific
19 meaning. The meaning comes
20 from Section 1902A10, which
21 was one of our supplemental
22 exhibits filed last summer as
23 Intermediary Exhibit 8, and
24 it's pages 11 through 15 of
25 our handout. And what you

181

65

```
 1         will see right in the
 2         beginning the term used is for
 3         making medical assistance
 4         available, including certain
 5         types of care.  And it lists,
 6         as I counted them some 24
 7         separate groupings of
 8         individuals, and then goes on
 9         to list the types of benefits
10         that these individuals are
11         entitled to, and there's some
12         variations under Medicaid.  So
13         when the, because it's using
14         the same term, and this term
15         -- I'm having a little of Mr.
16         Lucas's problem.  Let me just
17         take a drink here.
18  THE CHAIRMAN:
19         We can take a break.
20  MR. TALBERT:
21         I'm kind of in the middle if
22         you just let me settle down
23         here.  I should have done this
24         before.  What medical
25         assistance under a
```
York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

66

```
 1         state-approved plan means are
 2         the people listed in 1902A10,
 3         and both their inclusion in
 4         the state plan and the
 5         required benefit structure has
 6         to be approved in order for
 7         the days for those patients to
 8         be counted.  But there's
 9         nothing in 1902A10 or the
10         reference in the Medicaid
11         proxy in -- that creates DSH
12         in this statutory provision
13         that allows room for anybody
14         else to creep in.  So our
15         position is that there's no
16         inconsistency between the
17         statute's use of medical
18         assistance under a state plan
19         and the shortcut term of
20         Medicaid in the Medicare
21         regulation.  They're talking
22         about the same thing, and in
23         fact, when we look at the
24         workings of HCAP, we found
25         kind of the same flip flopping
```
York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

67

```
 1         or use of the same language.
 2         When you look at the statute,
 3         and specifically, the section
 4         I quoted earlier, 17, which
 5         imposes the obligation to
 6         provide care free of charge to
 7         the Ohio citizens not
 8         receiving medical assistance,
 9         when you look at Intermediary
10         Exhibit 4, which is page 16,
11         this is the section of the,
12         not the statute but HCAP's
13         implementation kind of
14         equivalent to the Medicare
15         regulation.  Instead of using
16         medical assistance it just
17         says that free care has to be
18         provided to residents who are
19         not recipients of the Medicaid
20         Program but whose income is at
21         or below the Federal poverty
22         level.  So the HCAP uses
23         medical assistance and
24         Medicaid interchangeably just
25         as the Medicare statute, the
```
York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

68

```
 1         DSH statute and the Medicare
 2         regulation.  So there's no
 3         gap.  As part of the overall
 4         Medicaid programs, hospitals
 5         can, in addition to providing
 6         for care for individuals
 7         listed in 1902A10 and having a
 8         specific benefit structure,
 9         there's also the ability of
10         states to make a separate
11         payment to its hospitals who
12         provide a disproportionate
13         share of care to, I'll use the
14         broad term now, to the needy.
15         States can do that, and if
16         certain conditions are met,
17         then that will be also matched
18         by Federal Medicaid and the
19         state DSH or the Medicaid DSH
20         is part of the Federal plan.
21         Is part of the state plan.
22         And, again, the statutory
23         references are Section 1923A
24         and B, which is at page, I
25         think at page 17 of our
```
York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

69

handout. A talks about the
state DSH, and B, which is at
page 19, talks about some of
the alternative calculations
used to calculate the Medicaid
DSH, which is part of the case
but not its issue. And when
you look at the different
criteria or different
calculations, there is a
separate one based on
traditional Medicaid, the
hospitals, and I'm looking at
B-2, where when you're talking
about low income, it
separately identifies as one
factor patients who are
eligible for medical
assistance under a state plan
approved under this title, and
then separately brings in the
type of supplemental patients
that supplemental payments for
other patients that a state's
DSH Program may be it. So the

70

distinction that we're making,
the language that we're using
that all, that in terms of the
Medicaid DSH proxy, refers to
specific individuals eligible
for medical assistance under a
state plan refers back to 1902
and is the opposite or the
antithesis of who is covered
under HCAP. So once again as
you go through the statute,
the other portions of the
Social Security Act, when you
get into the Medicaid Program,
which preserves and nails down
the -- who -- what medical
assistance under a state plan
means. And it doesn't mean
care that might be compensated
or financed for other people,
again, which is what HCAP is.
So I want to say that the
Provider or maybe personalize
it. Mr. Lucas and I are
probably in agreement on the

71

other person's central
argument, the other side's
central argument, just dismiss
the significance. We agree
that the state DSH, the HCAP
payments in the aggregate are
part of the state plan and do
get Federal participation. I
think it's undisputable,
indisputable that the patients
who, again, are covered or get
the benefit of the HCAP, by
definition are not patients
who are eligible for medical
assistance under a state plan.
That's what their law says.
That's what their implementing
regulation says, and I don't
see how you can kind of
broaden that term, medical
assistance under a state plan,
to cover some generic notion
of the state indigent
patients. I said we would
comment about the Jersey Shore

72

Decision, the administrator
Decision is I-5, and we think
the Provider neglected to talk
about what happened to Jersey
Shore. The Board's Decision
is at P-9. We didn't include
those in our handout package.
The Board didn't make a
finding in favor of the
Provider on two different
issues. On review by the
administrator, and I think
you'll have to refer back in
Jersey Shore to the section on
charity care. I'm going to
have to read this. It's not
that long, because it's really
-- we're sort of back
finishing the Jersey Shore
case maybe six, 700 miles west
of New Jersey. "The
administrator finds that
although the Board made a
finding that FFP," which is
Federal Financial

73

Participation, was paid for the charity care days at issue, the evidence is limited to a Provider stipulation. Moreover, having made a finding that FFP was paid, the Board did not determine whether the FFP was for the services rendered to the individual charity care patients or was a payment made to the Medicaid DSH provisions for hospitals that serve a disproportionate share of low-income patients." Here it's -- I think the record should be clear that we're talking about the latter. FFP is not for individual, matching individual patients. It's for matching the whole state DSH program. Consequently, the administrator remands this case for further development

74

of the record with respect to whether matching Medicaid FFP funds as opposed to other Federal programs were paid for individual charity care patients. In this case they weren't or whether matching Medicaid FFP funds were paid as part of the Medicaid DSH payment, which is what happened here. And then the administrator's challenge is to go -- now, once you make that finding, what's the legal affect, if any. And that's really what we're arguing is what is the legal affect. Now, the Jersey Shore case -- so the Board of -- the administrator effectively vacated the Board's Decision. There's no further record of judicial review. Common knowledge or common industry, and you know, Mr. Lucas or his

75

associates may take this on, that the Jersey Shore case ultimately led to program memorandum A99-D62, which is part of the record and part of, I mean, we're not arguing this case off of that. We're arguing this case on our position that the legislation, that the Medicaid proxy and the statute and in the regulation are consistent and cover traditional Medicaid and what's brought in through the state DSH is out of the legislative construction. But, again, the Jersey Shore case really had no end, but we believe it is a good segue into the Board's challenge in this case, and again, we've gotten to the question, but we think the legal answer is that the fact that certain care, if you can extract days out of it

76

which are part of the DSH, the state's DSH, which by definition covers indigents who are not eligible for medical assistance, those patients once you identify them, do not belong in the Medicaid proxy. That's the same result whether you read the statute or the regulation and our bottom line position is that the days that the Provider seeks to count should not be counted. Thank you.
THE CHAIRMAN:
    Thank you, Mr. Talbert. Let's take a break. About ten minutes.
               ***
[Off the record]
[On the record]
               ***
THE CHAIRMAN:
    Mr. Lucas, you may call your first witness.