77

MR. LUCAS:
    Thank you very much, Madam Chairman. I have Mr. Charles Cataline on the phone. I believe he's still on the phone.
THE CHAIRMAN:
    Mr. Cataline, are you there?
MR. CATALINE:
    Yes. I'm here.
THE CHAIRMAN:
    Okay. Mr. Cataline, would you raise your right hand, please?
MR. CATALINE:
    Yes, ma'am.
            ***
[Witness sworn]
            ***
THE CHAIRMAN:
    Okay. Go ahead, Mr. Lucas.
MR. LUCAS:
    Thank you very much, Madam Chairman.
            ***
        CHARLES CATALINE,

78

having been first duly sworn, was called as a witness herein and was examined and testified as follows:
            ***
        DIRECT EXAMINATION
BY MR. LUCAS:
    Q. Mr. Cataline, can you state your name for the record?
    A. Charles Cataline.
            ***
MR. LUCAS:
    Before we get started, can everybody hear him?
THE CHAIRMAN:
    Is everybody up here okay with it? Yes. Thank you.
MR. TALBERT:
    I'm just wondering if maybe we could do a little housekeeping, and I would like to maybe move the table, that table, get a little closer. Maybe you could use the other side of the table.
MR. LUCAS:

79

    If you can't hear, I'm -- I can hear him, but if you want to move closer, feel free.
MR. TALBERT:
    Okay.
THE CHAIRMAN:
    Let's just go off the record for a minute, and we'll do a little...
            ***
[Off the record]
[On the record]
            ***
MR. TALBERT:
    Thank you.
MR. LUCAS:
    We're back on the record, Mr. Cataline.
            ***
BY MR. LUCAS:
    Q. Can you tell the Board where you live?
    A. I live in Columbus at 111 East Frankfort Street.
    Q. And how old are you, Mr.

80

Cataline?
    A. Fifty-two.
    Q. And where are you employed?
    A. The Ohio Hospital Association.
    Q. Can you tell the Board what the Ohio Hospital Association is?
    A. In essence the Ohio Hospital Association's a trade association that represents the -- approximately 170 or so hospitals and health systems in Ohio. We also have about 1,900 personal members, and we represent them with advocacy and services, things of that sort.
    Q. And what is your...
    A. ...hospital trade association.
    Q. Did we get that last statement?
    A. I said in essence we are the state hospital trade association.
            ***
THE CHAIRMAN:
    Okay. Thank you. Go ahead.

81

```
 1                    ***
 2  BY MR. LUCAS:
 3       Q. And Mr. Cataline, what is
 4  your current position with the Ohio
 5  Hospital Association?
 6       A. I'm the senior director of
 7  health policy.
 8       Q. And you, can you briefly
 9  describe what your responsibilities
10  are in that position?
11       A. I help OHA member hospitals
12  with interpreting and managing
13  payment policies and procedures, and
14  basically I cover a variety of
15  Federal, state, and private
16  healthcare insurers and payers.
17       Q. And for how many years have
18  you been involved with Federal,
19  state, and private pay reimbursement
20  issues?
21       A. A little more than 25
22  years.
23       Q. And do you frequently make
24  professional presentations on
25  reimbursement issues?
```

82

```
 1       A. Yes. Yes, I do.
 2       Q. We've already had marked as
 3  an exhibit in this hearing a copy of
 4  your CV, which I believe is marked
 5  P-27. Is that, in fact, a copy of
 6  the CV that you provided to me?
 7       A. Yes, it is.
 8                    ***
 9  MR. LUCAS:
10       I am correct about the number.
11       Right?
12  THE CHAIRMAN:
13       Yes. That's right.
14  MR. LUCAS:
15       Thank you.
16                    ***
17  BY MR. LUCAS:
18       Q. would you briefly describe,
19  Mr. Cataline, the other positions
20  you've had with the Ohio Hospital
21  Association and the responsibilities
22  you've had in those positions?
23       A. I've been the director of
24  health policy, and at that point had
25  essentially the same responsibilities
```

83

```
 1  as I do now. Prior to that I was
 2  director of patient financial
 3  services. I assisted OHA member
 4  hospitals with the management and
 5  collection of patient receivables and
 6  the data that supports that.
 7       Q. And does your cirriculum
 8  vitae accurately describe your
 9  employment history and...
10       A. Yes, it does.
11       Q. ...your educational
12  background?
13       A. Yes, it does.
14       Q. Now, as part of your job at
15  OHA are you familiar with a program
16  in Ohio called the Ohio Hospital Care
17  Assurance Program?
18       A. Yes.
19       Q. And is that program
20  sometimes referred to as the HCAP
21  program?
22       A. Yes. That's true.
23       Q. Would you explain to the
24  Board how you are familiar with the
25  Ohio HCAP Program?
```

84

```
 1       A. In combination with a
 2  colleague, Ryan Biles [ph], who is
 3  OHA manager of health policy, we
 4  assist member hospitals with the
 5  collection and the reporting of
 6  Medicaid cost report data that's in
 7  use by the Ohio Department of Job and
 8  Family Services to calculate HCAP
 9  assessments and payments.
10       Q. Can you briefly describe
11  what the Ohio HCAP Program is?
12       A. Essentially it's a program
13  that provides medical assistance to
14  uninsured indigent hospital patients.
15       Q. And how does the HCAP
16  Program provide medical assistance to
17  insured indigent care patients?
18       A. It does it through a
19  combination of Federal and state laws
20  and rules and through these it
21  provides in essence a basic package
22  of hospital medical benefits to
23  Ohio's indigent, uninsured
24  population.
25       Q. And does the HCAP Program
```

186

85

also provide a mechanism to pay hospitals for that care?

A. Yes. As I mentioned, there's a combination of Federal and state laws that work together to provide care, and the way they kind of like -- I've organized it in my mind for this morning, is to kind of talk about some of the sections that have been mentioned earlier, I think, in the opening arguments. Really, first Section 5112.17 of the Ohio Revised Code requires hospitals that receive HCAP payment to provide care free of charge to uninsured, low-income Ohio residents. Then in Section 5112.18, the Ohio Revised Code specifically conditions the receipt of any Federal matching funds that flow through HCAP, it conditions it on a hospital's adherence to 5112.17, which is the requirement that they provide the care. Then further, the Ohio Revised Code Section 5112 or as defined in

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

86

5112.17, the Ohio Department of Job and Family Services is ordered to create a state rule that's in the Ohio Administrative Code that then outlines how that care is supposed to be -- to whom it's given, the package of benefits, et cetera. All that is outlined in public rule as a result of the statute that orders the Department to do that, and then finally, again, back to the Ohio Revised Code, ORC Section 5112.08, orders ODJFS to establish a method to allocate HCAP funds specifically based on the amount of care the hospitals provide to low-income patients in relation to the amount of care other hospitals provide. So when we take all of these laws and rules together, that is how the, how in our mind HCAP equates the free care that's given directly to low-income, Ohio residents, you know, based on the laws and rules we mentioned.

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

87

Q. So is the HCAP Program in Ohio designed to require hospitals to provide care to indigent patients and to also provide a mechanism to pay Ohio hospitals for providing that care?

A. Yes.

Q. Is the Ohio HCAP Program funded on both a Federal and state level?

A. That's correct. HCAP is supported by both Federal and state funding. The state portion is backed by an annual assessment on hospitals. The Federal Government provides matching funds as was described, I think, in the opening arguments.

Q. Are you familiar with Title 19 of the Social Security Act?

A. Yes, I am.

Q. Is that generally referred to as the Medicaid statute and the programs related to it?

A. Yes. That's right.

Q. Are you also familiar with

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

88

the Ohio state plan for which approval is sought under Title 19?

A. Yes, I'm familiar with them.

Q. Now, as part of your job responsibilities at OHA, do you know whether the Ohio HCAP Program is part of Ohio state plan approved under Title 19?

A. Yes, it is.

Q. And has the Ohio HCAP Program been part of Ohio state plan approved under Title 19 since at least 1988?

A. Actually, the one, the state plan amendments that I have go back to 1992, and in every one of those HCAP is part and parcel of the state plan.

Q. Okay. And as far as you know it dates back to 1988, as well. Correct?

A. Yeah. The program goes back to 1988. It's just that based on my own experience and the plans

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

89

that I have, I have them only back to '92, but there is no reason that, to the extent that HCAP was funded in the way that it is now and it generally was, that it would not have been part of the state plan back to '88.

Q. And you referred to the documents that you have. I've asked for the documents to be marked as Exhibit P-14 in this matter, and are those the documents -- strike that. Do you have Exhibit P-14 in front of you?

A. Yes. I have the state plan amendments back to 1992.

Q. And what do those documents show?

A. Inexplicably that HCAP is part of the annual state plan.

Q. Now, you testified that you're the person that's responsible for interpreting Federal and state healthcare reimbursement policies and procedures for OHA. In that capacity

90

are you familiar with the Federal DSH statute?

A. Yes, I am.

Q. And let me direct your attention to what's been marked as Exhibit P-5 for this hearing, which is the relevant portion of the Federal DSH statute. That's part of the Provider's position paper. Do you have that in front of you?

A. Yes, I do.

Q. And we talked earlier in the hearing about page 9 of the exhibit, which is the language at issue in this hearing. Do you have that in front of you?

A. Yes, I do.

Q. And does that particular section describe what patient days should be included and calculated into this proportionate share percentage?

A. Yes, it does.

Q. And as the Ohio Hospital Association's senior director of

91

policy, do you have an opinion as to whether the Ohio HCAP Program days should be included in calculating the disproportionate share percentage under the DSH statute?

A. Yes. We feel strongly they should.

Q. And tell me why Ohio HCAP Program days should be included in the Federal disproportionate share statute.

A. To the Ohio Hospital Association it's rather a black and white argument. It is plain in Federal Medicare DSH statute that all days eligible under medical assistance under a state plan approved under Title 19 should be included. So the Ohio HCAP Program meets this requirement and the days that can be allocated to it should be included in the Federal DSH count as well.

***

MR. LUCAS:

92

That's all the questions I have of Mr. Cataline for now.

THE CHAIRMAN:

Okay. Mr. Talbert, do you have cross examination?

MR. TALBERT:

Yes. Good morning, Mr. Cataline.

MR. CATALINE:

Good morning.

***

CROSS EXAMINATION

BY MR. TALBERT:

Q. Could you turn to the -- do you have the complete position papers filed by both parties that we're working off of?

A. If you -- I have a rather large document called Provider's final position paper if -- I guess Community Hospital.

Q. Okay.

A. That we're using as a standard for the other 17 hospitals.

Q. Okay. Good. Could you

188

93

turn -- yeah. Maybe I'll take you through these one by one. Do you have Provider Exhibit 7?
   A. Yes, I do.
   Q. You were referring to Section 5112.17B. And as I read it...
   A. I have it in front of me.
   Q. Pardon me?
   A. I have it in front of me.
   Q. Okay. Now, as I read this a hospital is obligated to provide maybe as a short term free care to residents who are not resident, who are recipients of the medical assistance program but whose income is at or below the Federal poverty guideline. Is it correct to say that the -- if I use the term beneficiaries of HCAP, are Ohians who are not recipients of what we call traditional Medicaid but yet meet a certain income level?
   A. That is correct.
   Q. Okay. Now, can you explain

94

the process by which a hospital may be using Community Hospital, as an example, makes a determination as to whether an individual who presents themselves for care is eligible for free care?
   A. Yeah. They use as a guideline the Ohio Administrative Code rule that I referenced a little bit earlier. For the record it's 5101:2-07.17.
   Q. Uh-huh.
   A. And in that it basically sets up the application criteria, it sets up the size of the family, it sets up how to define income. Basically that is the guideline that hospitals use to determine who's eligible and who's not. If that free -- I call it collectively the free care rule.
   Q. Okay.
   A. And in essence that then created then out of the requirements that are in statute for a hospital to

95

receive HCAP funds
   Q. Okay. And as part of that process does the hospital make a determination that, in fact, the patient is not a recipient of the medical assistance program as the term is used in Section B?
   A. I guess, yes, we make sure that Medicaid patients aren't involved. I guess personally I have a problem with the equation of the phrase, medical assistance program, always meaning Medicaid. And I guess the reason I say that is that I don't think medical -- I think medical assistance program is really a generic term.
   Q. Okay. And where does -- okay. I'm going to ask you then to look at what's been identified as Intermediary Exhibit -- let me find it. Intermediary Exhibit 8. Do you have that?
   A. Is it P-8?
   Q. Pardon me?

96

   A. In the handout I have.
   Q. No. It's -- I don't know if Mr. Lucas provided you with the Intermediary's exhibit, but it's Section 1902A10 of the Social Security Act.
   A. I don't have that readily in front of me.
   Q. Okay. Has you ever -- do you know what that looks like, or have you ever seen it?
   A. No. That's not -- again, describe it for me one more time, please.
   Q. Okay. It's Section, the official section is 1902A10 of the Social Security Act.
   A. I -- I'm sorry. Go ahead. I didn't mean to interrupt.
   Q. And it starts out by saying it is part of the overall Federal Medicaid statute...
                  * * *
MR. LUCAS:
   Mr. Talbert, can I just

189

97

```
            interrupt you for a minute?
 2  MR. TALBERT:
 3         Yeah.
 4  MR. LUCAS:
 5         I did provide him with these
 6         briefs.  He may not know what
 7         you're referring to...
 8  MR. TALBERT:
 9         Okay.
10  MR. LUCAS:
11         ...and maybe it is worthwhile
12         to tell him exactly what
13         you're -- we're looking at.
14  MR. TALBERT:
15         Okay.  I'll try and do that.
16  MR. CATALINE:
17         One more time.  This is
18         Section 8 then of the
19         Intermediary final position
20         paper for Community Hospital,
21         Section 8 behind there?
22  MR. TALBERT:
23         Yeah.
24  MR. CATALINE:
25         Okay.  I have it in front of
```

98

```
 1         me now.  It was just I have an
 2         enormous amount of papers
 3         here.  It got lost.
 4  MR. TALBERT:
 5         Yeah.
 6                    ***
 7  BY MR. TALBERT:
 8         Q.  Do you recognize that
 9  statute?
10         A.  No, not off the top of my
11  head I don't.
12         Q.  Okay.  Do you see the term,
13  medical assistance, used under A?
14         A.  Yes, I do.
15         Q.  Okay.  And then you see a
16  listing of different types of
17  individuals with various income or
18  family standards that goes through
19  the next, the first four pages?
20         A.  Yes, I see that.
21         Q.  Okay.  Now, is it your
22  testimony that medical assistance is
23  a generic term?
24         A.  Yes.  And my rationale for
25  that is medical assistance can mean
```

99

```
 1  any number of things.
 2         Q.  Okay.
 3         A.  It could mean Medicaid, it
 4  could mean disability assistance
 5  medical, which is a county program
 6  that provides limited benefits to
 7  folks who aren't eligible for
 8  Medicaid but still are on low, very
 9  low income and meet county
10  eligibility guidelines.  But, again,
11  the title of that is disability
12  assistance medical.
13         Q.  Okay.
14         A.  So when someone says a
15  medical assistance program, it could
16  be Medicaid, it could be what we call
17  DAM, that's Disability Assistance
18  Medical, the county program, it could
19  be, you know, any number of county or
20  city or community levies that provide
21  monies for low-income persons that
22  reside in that community.  So, again,
23  I mean, I think to myself and to most
24  hospitals the term, medical
25  assistance program, could be used in
```

100

```
 1  any number of ways.
 2         Q.  Well, this may be a
 3  question Mr. Lucas may have to answer
 4  in a post hearing, but if you could
 5  take a brief look through that
 6  Intermediary Exhibit 8 and see if you
 7  can find some kind of a catchall or
 8  something that would bring into this
 9  -- under this statute the HCAP
10  beneficiaries.
11         A.  Are you asking I read it
12  now and respond?
13         Q.  If you could, yeah.  It's
14  not that long.
15         A.  All right.  And, again,
16  what are you asking me to find here?
17         Q.  I'm asking you to find if
18  there's some -- looking under for
19  making medical assistance, I'm
20  looking at the title A, for making
21  medical assistance available...
22         A.  Correct.
23         Q.  ...including care and
24  services to all individuals, and then
25  it lists some 25 categories of
```

101

individuals. And I want to see if you see some kind of a catchall that, anywhere in that section which would support your position that medical assistance is a broader term than the specific people mentioned here.

   A. Well, I'm scanning it now, and I don't see anything that says medical assistance could equate a broader term than CMS wants it to say, but I don't see anything that says it isn't either.

   Q. Okay. Okay. I'll accept that. Now, in terms of distributing the HCAP funds, what role does the properly-identified provision of free care under 5 -- I'm sorry, 5112.17B, play in the distribution?

   A. Okay. I'm looking at 511.217B.

   Q. Yeah. That's where you started your discussion with Mr. Lucas.

   A. I beg your pardon?

   Q. That's where you started

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

102

your discussion with Mr. Lucas. And my question is how does care which meets the test and is on to meet the test of free care to individuals who are residents of the state but not recipients of medical assistance, a medical assistance program, what role does that play in the distribution of the HCAP funds?

   A. Well, in essence it kind of, again, flows between some of the Federal and state laws that I tried to mention earlier. In fact, 5112.17, if you go to Section 5112.08, that conditions the receipt of HCAP funds on 5112.17.

   Q. Okay.

   A. And then when you go to 5112.08, that conditions the distribution of those funds on the free care rule that we mentioned earlier, which is the Ohio Administrative Code, 5101:3-2-07.17. So when I look specifically at 5112.17B, there is nothing there that

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

103

talks about the distribution of funds to specific Ohio residents there, but we would maintain that one section of the statute doesn't exist in a vacuum. Zero eight conditions funds on 17, 08 also conditions funds on the distribution as outlined in a state rule, which is 5101:3-0717, so I don't -- in our minds they can't be viewed in a vacuum. Each one then works in tandem with others.

   Q. Okay. Let me ask you a hypothetical question if you can follow here.

   A. Sure.

   Q. Okay. We have hospital A and hospital B. And they provide an identical amount of care that is financed by traditional Medicaid, that in both hospital A and B 10 percent of their patients are Ohio Medicaid, covered by Medicaid, and the hospital receives $10 million from the Medicaid Program for their care. Are you with me so far?

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

104

   A. I think so. Yes.

   Q. Okay. Hospital A provides twice as much HCAP or free care than hospital B does. Okay. Are you with me on that?

   A. Okay.

   Q. Will hospital A receive a -- yeah. A is twice as much. Will hospital A, all other things being equal, receive a larger distribution of the HCAP funds than hospital B?

   A. Yes.

                    ***

MR. LUCAS:
   I'm just going to object to
   the hypothetical.
MR. CATALINE:
   Now, there are some
   requirements in Federal law...
THE CHAIRMAN:
   Excuse me.
MR. CATALINE:
   ...some...
THE CHAIRMAN:
   Just a minute, Mr. Cataline.

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

191

105

    Excuse me just a minute.
MR. CATALINE:
    Yes, ma'am.
THE CHAIRMAN:
    We have an objection. Let me
    deal with that.
MR. LUCAS:
    I just wanted to object to the
    hypothetical as not defining
    all of the relevant elements
    that may need to go into the
    calculation of the
    distribution, but subject to
    that, he can go ahead and
    answer if he can.
MR. TALBERT:
    Okay.
THE CHAIRMAN:
    Okay.
      ***
BY MR. TALBERT:
  Q. Again, just answer the
hypothetical, because I think it's
clear the point we're getting to.
Let's assume all other things are

106

equal, that there's no other
complications. Okay. Would the
hospital that provides a greater
share of HCAP care, free care, to the
eligible recipients receive a larger
distribution of the HCAP pool?
  A. Yes. Theoretically.
Again, the only limits with that
would be a Federal law that puts an
individual, we call it the over cap,
if you will, they put the limit on
the amount of money through the HCAP
Program that each individual hospital
can receive. But absent the over cap
and all other things being equal, the
hospital that gives twice as much,
can document twice as much on
compensated care that fits the
guidelines for HCAP, will receive
more money than a hospital that
delivers half as much.
  Q. Okay. I'm winding down,
Mr. Cataline. I'm back at P-7,
looking at really the definitions
which are at the beginning of the

107

statute. I want to ask you about the
indigent care pool that takes into
account the total assessments against
the hospitals. Is that correct?
  A. Yes, it does.
  Q. Okay. Now, because I don't
understand what two is, could you
maybe give a quick explanation?
  A. I apologize for that. That
level of detail is not something that
I personally handle, so I'm going to
have to say I really can't well
explain the interactions of an
inter-Governmental transfer. We have
other staff at OHA that handle that
level of detail.
  Q. Okay. And then three
includes the total amount of Federal
matching funds that will be made
available.
  A. I see that. Yes.
  Q. Do you see that?
  A. Yes.
  Q. Do you have -- do you know
how the amount of the Federal

108

matching funds are identified and
apportioned or allocated to this
indigent care pool? Do you know how
that works?
  A. I'm sorry, Mr. Talbert. I
didn't understand your question.
  Q. Okay. The -- just go back.
E defined the indigent care pool.
  A. Yes.
  Q. I guess ultimately what's
distributed back to the hospital.
Isn't that so?
  A. Yeah. The sum of all
those. Yes. That's correct.
  Q. Okay. And we talked about
the assessments. I think we know
what those are. We're not sure what
the inter-Governmental transfers are,
but I'm referencing them, saying
that's not important. And now I'm
asking you that the total amount of
Federal matching funds, there's an
amount that also gets into the, into
this indigent care pool.
  A. I believe that the total

109

amount of the Federal matching funds
that they are talking about here
equals the match to the assessment
that hospitals pay on an annual
basis. Those are matches by the
Federal Government each year and then
returned to Ohio to be distributed,
and I believe what they mean by the
Federal matching fund is the amount
of money the Federal Government
matches to the assessment dollars
that the hospitals provide.
    Q. Okay. Thank you. That's
what I thought your answer would be.
    \*\*\*
MR. TALBERT:
    And I have no further
    questions at this time. Thank
    you.
MR. CATALINE:
    Thank you.
THE CHAIRMAN:
    Mr. Lucas, do you have
    redirect?
MR. LUCAS:

110

    I do not. Thank you.
THE CHAIRMAN:
    Mr. Cataline, we will permit
    the Board to ask you questions
    now and then your, both the
    attorneys will have an
    opportunity to ask further
    questions based on the Board
    questions.
MR. CATALINE:
    Yes, ma'am.
THE CHAIRMAN:
    Ms. Powell.
MS. POWELL:
    Yes.
    \*\*\*
BY MS. POWELL:
    Q. Mr. Cataline, is it
possible for an Ohio resident to be
covered under both HCAP and Medicaid?
    A. No, ma'am, it's not. It's
specific in the free care rule that I
talked about, 5101:3-2-0717, it
specifically says that if any patient
is eligible for Medicaid in any

111

state, they are categorically not
eligible for HCAP.
    Q. Okay. And I understood
your interpretation of the term,
medical assistance, to be a generic
term. Is that correct?
    A. Yes, ma'am.
    Q. Okay. Would you turn with
me to P-7, page 9, once again? The
now popular 5112.17B. I'm a little
bit unclear as to why you would make
that statement, because when it talks
about the medical assistance program
in the third line, it says, "And are
not recipients of the Medical
Assistance Program."
    A. Forgive me. I'm still
searching for...
    Q. Oh. Okay.
    A. ...that section. What was
it again, please? I'm sorry.
    Q. It's Exhibit P-7.
    A. P-7.
    Q. Page 9.
    A. Mine is not paged, so I'm

112

going to count it back.
    Q. Good. I was relying on
your attorney's counting and
referring us to them. It is...
    \*\*\*
MR. LUCAS:
    It's the third page in.
MR. TALBERT:
    I'm not his attorney.
MS. POWELL:
    Third page in. Okay. No.
    That's not -- no.
MR. LUCAS:
    What are you looking at?
MS. POWELL:
    I'm looking at 5112...
MR. LUCAS:
    Yeah.
MS. POWELL:
    ...point 17.
MR. LUCAS:
    Point 17.
MR. TALBERT:
    It's actually the ninth page
    in that exhibit.

113

MS. POWELL:
  Ninth page in.
MR. CATALINE:
  Oh. One seven.
MS. POWELL:
  Okay.
MR. CATALINE:
  I'm sorry. I had that tabbed
  differently. Okay. Now, and
  you're talking about 5112.17B?
MS. POWELL:
  B. Yes.
MR. CATALINE:
  Thank you.
        ***
BY MS. POWELL:
  Q. And I'm reading at the third line. It says, discussing the qualifications of individual residents of this state who are, "Not recipients of the Medical Assistance Program."
  A. Ma'am, I do see the B, and I think that's what probably triggers the question, but honestly, ma'am, I

114

have no idea what was the intent of the Ohio General Assembly when they passed that law and what that phrase meant to them. And further, when we're talking about medical assistance programs, in my mind, again, we go back to what I referred to as the DAM, the Disability Assistance Medical Program. That, again, represents a county, sort of a county counterpart to Medicaid, and is categorically included in HCAP. In the same way that Medicaid is categorically excluded by the rule, Disability Assistance Medical Programs are categorically included.
  Q. Okay.
  A. That's kind of why I'm saying that I think this is a generic term, although I have to admit I do not know what the legislative intent was when that law was written.
  Q. Okay. In your opinion is the HCAP what's commonly referred to as an expansion of eligibility-type

115

benefit program?
  A. I apologize. The phone just kind cut out a little bit. Would you repeat the question?
  Q. Yes. I said in your opinion is the HCAP Program administered by the State of Ohio essentially an expanded eligibility-type program for low-income persons not eligible for Medicaid?
  A. If the question is does the...
        ***
[Tape 2 Side 1]
        ***
MR. CATALINE:
  ...department administer HCAP the same way that the State of Ohio administers Medicaid, I'd say no.
MS. POWELL:
  No. That's not the question.
        ***
BY MS. POWELL:

116

  Q. My question is this. There's a lot of Federal registers that discuss expanded eligibility programs, and I'm just wondering whether or not the HCAP is an add on for indigent folks who don't qualify for Medicaid.
  A. I apologize. Maybe we look at terms differently, but to me the phrase, expanded Medicaid Program, that to me stands for stuff like the CHIP Program, where they expanded Medicaid eligibility through one statute or another to cover a wider range of recipients in traditional Medicaid.
  Q. Okay.
  A. That really doesn't refer to HCAP to me at all.
  Q. Okay. Well, then that's fine. I may have mixed my -- those things in my mind. So Ohio's -- the assessments that the Ohio hospitals receive are matched by the Federal Government. Correct?

194

117

A. Yes, ma'am.
Q. Are they matched 60, 40? Right?
A. I believe that to be the case, thereabout.
Q. Okay. And under what title does the Federal Government match those funds?
A. Under what title?
Q. Yes.
A. I'm afraid I don't know that.
Q. Okay. Do you think it's Title 19, or would it be something else?
A. I would think in that the HCAP Program itself is included in the state plan that's driven by -- in Title 19, yes, I could make an assumption that it's there, but I don't know that categorical.
Q. Okay. I think that we have introduced in the record additional exhibits in two loose leaf binders that have documentation of the fact

118

that HCAP was included as part of the Medicaid state plan.
A. Yes. That is true.
Q. Okay. For 1992, forward.
A. Yes, ma'am. I have those same documents.
Q. Okay. Is it your testimony that there was nothing in any action by the Ohio or the Federal Government that would have impacted the inclusion of HCAP in the other years in this case for which...
A. No.
Q. ...we don't have the documentation?
A. I apologize. I cut you off there, but I -- if the question is do I think that the -- it was part of the state plan back to 1988, I have no reason to think it's not. I just don't have the state plans in front of me, so it's difficult for me to say for sure. But I have no reason to think it would not be.
Q. Okay. You're not aware of

119

any Federal or Ohio law that would have impacted it either way?
A. No, ma'am, I'm not.
Q. Okay. I had a question -- okay. I think that one's been resolved. Do you know whether or not the HCAP assessed funds are matched in the same manner as Medicaid?
A. I'm sorry. No, I don't. I would imagine they're both about a 60, 40 match, but do I know that for sure? No.
Q. Okay. But is Medicaid matched on individual patients where HCAP is matched on an assessment type thing? Or do you know?
A. Again, ma'am, I don't know. I do not believe that the Federal matching funds for Medicaid are allocated on a recipient-by-recipient basis. I don't think they are, but again, I apologize. I don't know for sure.
Q. I don't know at all. So you're ahead of me if you don't know

120

for sure.
                    ***
MS. POWELL:
    Thank you very much.
MR. CATALINE:
    Thank you.
THE CHAIRMAN:
    Dr. Blodgett.
DR. BLODGETT:
    I don't have any questions for Mr. Cataline.
THE CHAIRMAN:
    Mr. Hoover.
MR. HOOVER:
    I don't have any questions. Thank you for your testimony, Mr. Cataline.
                    ***
BY THE CHAIRMAN:
Q. Mr. Cataline, just to follow up a little bit on one of Ms. Powell's questions, she asked you about -- this would be under Exhibit P-7, and this is the Ohio statute, specifically Section 5112.17...

121

      A. Yes, ma'am.
      Q. ...B, that we've been referring to often, and the meaning in that section of the medical assistance program.
      A. I see that. Yes.
      Q. I believe you said you weren't certain what the Ohio legislature had in mind when they used that term.
      A. No, ma'am, I don't.
      Q. Would you look a few pages toward the front to 5112.01? It would be the third page of that document, and Section G, capital G.
      A. Yes. I'm there.
      Q. Okay. Would you just read that Section G?
      A. "The Medical Assistance Program means the program of medical assistance established under Section 5111 of the Revised Code and Title 19 of the Social Security Act."
      Q. Okay. We don't have, I don't believe, in the record Section

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

122

5111. Do you know what that is?
      A. I apologize. I don't.
      Q. Okay.
      A. My only comment there, though, if I may, is that when we, again, talk about medical assistance program being established under Title 19, it is the Medicaid state plan that establishes the Medicaid Program for Ohio, and HCAP is included in that. So I hope this isn't repetitive, but that's kind of our basic point. It seems clear from the statute and then the state plan that supports it that HCAP's included.
            * * *
THE CHAIRMAN:
      Okay. Thank you.
MR. CATALINE:
      Thank you.
THE CHAIRMAN:
      We will permit questions,
      follow-up questions based on
      the Board questions now. Mr.
      Lucas.

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

123

MR. LUCAS:
      I have nothing further.
THE CHAIRMAN:
      Mr. Talbert.
MR. TALBERT:
      Yeah. This ties into I think
      the question that Ms. Powell
      and Chairman Cochran asked.
            * * *
      RECROSS EXAMINATION
BY MR. TALBERT:
      Q. Do you have Intermediary Exhibit 4?
      A. If it's in the same handout that we referred to earlier, yes, I do. Let me get it, if I may.
      Q. Okay.
      A. Yes. I have it.
      Q. Do you recognize this?
      A. Yeah. That's what I referred to. That's one section of what I referred to earlier as the free care rule, the 5101:3-2-07.17.
      Q. Is this the Department of Job and Family -- is that, is this

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

124

the department that administers HCAP, is this their rule?
      A. Yes, sir, it is.
      Q. Okay. And what we're referring to, 5012.17B, that's the Ohio statute.
      A. Yes, sir.
      Q. Okay. Now, if you look -- is your understanding that this rule was in place or something very close to this was in place for the some ten-year time period that this controversy encompasses?
      A. I believe that this rule originally was promulgated in 1992. I am not -- I believe it was '92. Yes.
      Q. Okay. Now, you see in the fifth line down it used the term, not recipients of the Medicaid Program, and the statute uses, not receiving medical assistance?
      A. Yes.
      Q. Do you believe that the Administrative Code is consistent

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

196

125

1   with the statute as to the reference
2   to the Medicaid Program?
3          A.  Could I ask in which
4   section of the Ohio Revised Code
5   you're putting A and B together?  I'd
6   like to read what line that is
7   there...
8          Q.  Okay.  That is -- it's
9   probably worn out by now, but 5112...
10         A.  Oh, I'm sorry.  Okay.
11  You're talking about 5112.17B where
12  that...
13         Q.  Yes.
14         A.  ...phrase, the Medical
15  Assistance Program, is included?
16         Q.  Yes.
17         A.  And your question is do
18  I...
19         Q.  The question is is the Code
20  and -- the Administrative Code and
21  the statute, using the terms, medical
22  assistance and -- I'll be more
23  specific.  Not recipients of the
24  Medical Assistance Program in the
25  statute and not recipients of the

126

1   Medicaid Program.  Do those terms,
2   are they just two ways of expressing
3   the same thing?
4          A.  Mr. Talbert, I would be
5   supposing if I tried to guess what
6   was in the mind of the general
7   assembly when they wrote the law and
8   in the mind of the Department of Job
9   and Family Services when they
10  promulgated the rule ten years ago.
11  I really couldn't say.
12         Q.  Okay.  Well, do you think,
13  just based on your position, and if
14  you don't want to opine, I would
15  -- I'll just respect it, that the
16  drafter of the Code, which is -- of
17  the Administrative Code, would be
18  thinking of something different than
19  what the legislature was thinking?
20         A.  Well, again, I don't know,
21  but when we're speaking about my
22  opinion on this, and we're talking
23  about the fact that the Disability
24  Assistance Medical Program is
25  categorically included, you go

127

1   farther in that rule, 0717, you'll
2   find that they say Medicaid is not to
3   be included but the Disability
4   Assistance Medical Program, which
5   shares the same basic phrase, is
6   categorically included.  So we get
7   sort of confused here about what was
8   intended by the statute and what was
9   intended by the rule and how it's
10  being administered today.  So I have
11  kind of a problem putting forth an
12  opinion on that, because frankly, I'm
13  not sure.
14         Q.  Okay.  But just -- would
15  you, at least would you agree that
16  the statute when defining who
17  provides free care uses the term not
18  recipients of the Medical Assistance
19  Program, and the administrator rule
20  uses not recipients of the Medicaid
21  Program?
22         A.  It is a fact.  They say
23  that.
24         Q.  Okay.
25         A.  But I don't know, again,

128

1   what was the intent of the drafters
2   when that was put in.
3          Q.  Okay.
4                  * * *
5   MR. TALBERT:
6          I have no further questions.
7   THE CHAIRMAN:
8          Okay.  Mr. Cataline, thank you
9          very much for your testimony.
10         May this witness be excused?
11         Mr. Lucas?
12  MR. LUCAS:
13         Yes, he may.
14  THE CHAIRMAN:
15         Mr. Talbert?
16  MR. TALBERT:
17         Yes, he may.
18  THE CHAIRMAN:
19         Mr. Cataline, thank you very
20         much.  You are free to sign
21         off the line now.
22  MR. CATALINE:
23         Thank you, ma'am, and I also
24         appreciate very much the
25         Board's allowing me to do this

129

by telephone. It helped me a lot this week not having to be on the road. So I very much appreciate your helping me do this by phone.

THE CHAIRMAN:
Okay. No problem. We're glad to be able to accommodate your schedule. All right. Mr. Lucas, do you have any further presentation?

MR. LUCAS:
Yes. I'd like to make a short closing if I may.

THE CHAIRMAN:
Okay. Before you -- before we do, Mr. Talbert, do you have any...

MR. TALBERT:
No. I think...

THE CHAIRMAN:
...presentation of any witnesses?

MR. TALBERT:
...we -- all the points I

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

130

needed have been covered.

THE CHAIRMAN:
Okay. All right. Mr. Lucas, you may make your closing statement.

MR. LUCAS:
Thank you.

MR. HOOVER:
Is it possible to ask some questions of the Intermediary counsel or witness?

THE CHAIRMAN:
Certainly. And Mr. Hoover.

MR. HOOVER:
I'm not -- I think Mr. Talbert perhaps could answer this question. Is it the simplified Intermediary position that these days are excluded because these individuals were not eligible for Medicaid "traditional" coverage? Medical coverage?

MR. TALBERT:
That is our position. I mean,

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

131

there's always a but to it, there's something I'd like to add, but maybe I'll let you prompt me with a question.

MR. HOOVER:
No. My question is that medical assistance, you know, I'm -- I have a somewhat of a problem with it, the Provider's counsel's indicated it could be disability or the Provider's witness, some other county program, or -- well, are we defining medical assistance as also that medical coverage by traditional Medicaid?

MR. TALBERT:
Well, that's what we are, because the term, medical assistance, under a state plan in the Medicaid proxy is the exact same phraseology used in the description of the -- of who is eligible for Medicaid

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

132

and further is the exact phrase used in one of the mathematical calculations for the Medicaid DSH separate from the, you know, the kind of program we have here. So we think that there is consistency that, in fact, going back to the -- it flows through all of the relevant statutes that in the Medicaid DSH proxy, when the term, medical assistance under an approved state plan, that's Medicaid. That's what the meaning of it is, and that flows through the statutes. So there's no inconsistency in the regulations.

MR. HOOVER:
And those days then from your position, from the Intermediary's position has to be that that day is a covered traditional Medicaid coverage

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

198

133

```
 1              day, not that they have it,
 2              but they are eligible for it.
 3              And that's the...
 4   MR. TALBERT:
 5              That they qualified. Yeah.
 6   MR. HOOVER:
 7              ...only day that can be
 8              included in that proxy?
 9   MR. TALBERT:
10              I would say yes.
11   MR. HOOVER:
12              Thank you.
13   THE CHAIRMAN:
14              Okay. Any other questions?
15   DR. BLODGETT:
16              I have a question, just a
17              follow up. I was also in your
18              -- during your presentation,
19              Mr. Talbert, did I understand
20              you to say or to imply that
21              some of the HCAP days would be
22              eligible for -- to be included
23              in the DSH calculation and
24              some would not or...
25   MR. TALBERT:
```

134

```
 1              No. No.
 2   DR. BLODGETT:
 3              No.
 4   MR. TALBERT:
 5              It's all...
 6   DR. BLODGETT:
 7              It's not.
 8   MR. TALBERT:
 9              ...if it's all or nothing,
10              it's nothing. They all by the
11              very definition of being
12              eligible and again, of being
13              the type of days that Ohio
14              hospitals have to provide free
15              care to, by definition they're
16              not eligible for medical
17              assistance or Medicaid. And
18              therefore, they don't qualify.
19              There's no split that -- and
20              if I alluded to one, I'm
21              sorry, but, you know, I never
22              saw a split off of the HCAP
23              days and that some might be
24              okay and some might not be.
25   DR. BLODGETT:
```

135

```
 1              ..it's an ... or nothing
 2              situation?
 3   MR. TALBERT:
 4              Right.
 5   DR. BLODGETT:
 6              Thank you.
 7   THE CHAIRMAN:
 8              Okay. Mr. Lucas, you can go
 9              ahead with your closing
10              statement.
11   MR. LUCAS:
12              Thank you, Madam Chairman. I
13              have just a couple of points
14              on closing. As Mr. Talbert
15              has made clear, he defines
16              medical assistance to mean the
17              Medicaid Program. If you look
18              at the DSH statute, nowhere is
19              medical assistance defined as
20              the Medicaid Program. He's
21              relying on something that
22              defines medical assistance
23              program in Ohio law, and that
24              can't reflect the intent of
25              Congress as to what Congress
```

136

```
 1              meant by medical assistance.
 2              He's relying on Exhibit 8,
 3              which talks about medical
 4              assistance, and he says that
 5              means medical assistance under
 6              a state plan approved under
 7              Title 19, but that's not what
 8              it says there either. There's
 9              no definition for what medical
10              assistance means in the
11              disproportionate share
12              statute. So he's asking you
13              to make a leap of faith, to
14              say medical assistance under a
15              state plan approved under
16              Title 19 means Medicaid.
17              That's what he's saying. But
18              if you listen to what he says
19              and you look at the statute,
20              what he says doesn't make any
21              sense. And the reason for
22              that is if medical assistance
23              means Medicaid, then what the
24              DSH statute says is that you
25              include in the HCAP
```

137

calculation patients who are eligible for Medicaid under Medicaid or under a state plan under Medicaid. Medicaid's in there too many times. If Medicaid was intended to mean or if medical assistance was intended to mean Medicaid, then why didn't they just say medical assistance if that's what Mr. Talbert says it means? That's all they needed to say, but that's not what they said. They said medical assistance under a state plan approved under Title 19, which has a totally different meaning. As our witness indicated medical assistance can mean many different things. It's used many different ways by many different people to mean many different things. But if Congress had intended that

138

phrase to mean only the traditional Medicaid Program, they could have said it in so many ways that were easier than what Mr. Talbert says they said. Because they could have said eligible for medical assistance period. They could have said eligible under Medicaid period. They didn't say any of that. They said eligible for medical assistance under a state plan under Title 19. And by using all of those words it should be obvious to everybody that they were intending to mean something other than traditional Medicaid, because otherwise, if medical assistance is known to everybody that it means Medicaid, why didn't they just say medical assistance? Why did they need all that other

139

phraseology. Or why didn't they just say under Title 19. They didn't need all that other phraseology, and the reason they did it is what Congress intended was something broader than just traditional Medicaid. Otherwise they would have used different language. And by the way, nothing in anything he cites uses that exact phrase that's in the disproportionate share statute. Nowhere is that phrase defined, so he's asking you to take a huge leap of faith to get to that point. And the reality is that by using that additional language we can't ignore that additional language, and that additional language encompasses programs like HCAP, which are clearly

140

covered as recipients of or eligible for medical assistance under a state plan approved under Title 19. There is a perfect example of a program that's not traditional Medicaid, yet meets the statement that's being made in the disproportionate share statute. That's point number one. Point number two I wanted to make was just a comment on Jersey Shore. Mr. Talbert said that the case just died after the administrator remanded it, and we obviously don't have the facts as to what happened, but we do know what is critical under Ohio law. And if the administrator would ask the same question here, what we know is that under Ohio law the payments made to the

141

hospital are based upon the costs that they incur in providing the indigent care. So there is a direct tie between the costs that they incur and the patient care that they give and the distribution that they're entitled to. If they don't give the care, they're not entitled to a distribution. If they do give the care, then they're entitled to a distribution under the formula based upon the amount of care that they gave. So if the administrator was asking the same question in this case, there is a direct tie to the individual patient care that's given to Ohio HCAP patients and the distribution that they receive. So that is -- that puts us squarely under the Jersey Shore, but the fact

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

142

that it's a Medicaid DSH Program doesn't really matter. It's still a payment made to the hospital based upon the level of indigent care that they provide. So that tie is there. I would submit that we have established, based on the record evidence, that more than just traditional Medicaid should be covered by the disproportionate share calculation. We've established that it should include that broad category of patients eligible for medical assistance under state plans approved under Title 19. There's no question that the Ohio HCAP Program meets that requirement, and we would ask that the Intermediary's Decision not to include Ohio HCAP days be reversed. Thank you very much.

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

143

THE CHAIRMAN:
    Mr. Talbert.
MR. TALBERT:
    Yeah. Just quickly. I've got one little bit of resource to do post-hearing, and that's whether Medicaid, that eight-letter word, is a word of Congress that's used throughout the legislation, or it's just a common understanding of the program that is consistently referred to throughout all of the legislative pieces that we've put together. And there is an unbroken flow of the use of the term medical assistance under a state plan approved under Title 19, which carries forward to both the Medicaid, the eligibility section, which is 1902A10, which uses the term medical assistance, and the mechanics of the DSH,

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

144

which uses the same days for medical assistance under a state plan approved under Title 19. So we think that the terminology is clear, and days -- and programs which fall outside, if that's what you want to call traditional Medicaid, and I think that's really what medical assistance under a state plan approved under Title 19 is, then the days fall out. I think the importance of the -- and again, it's not just my opinion. It's the whole legislative construction, that when you talk about medical assistance under a state plan approved under Title 19, it's not sufficient to get Federal matching that the program has to cover the individuals, but it has to provide an approved benefit structure. So the

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

145

1   whole thing has to be
2   approved.  That's why that
3   language is used.  It's not
4   set up to enlarge the
5   definition of something other
6   than the, again, the specific
7   list in 1902A10.  It just
8   -- the qualifier approved
9   under Title 19 means that not
10  only do you have to prove the
11  eligibility to get matching,
12  but the benefit structure's
13  got to be right.  So we think
14  that any rational reading of
15  all of the legislation, you
16  can't just zero in on one
17  part, makes it absolutely
18  clear what the Medicaid proxy
19  and the DSH is about, and it
20  ain't about HCAP.  Thank you.
21  THE CHAIRMAN:
22      Do both of you intend to file
23      a post-hearing brief?
24  MR. LUCAS:
25      I would like the opportunity

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

146

1   to think about anything else
2   that might be important and to
3   submit anything.  I don't know
4   at this point that I will, but
5   I would like that opportunity.
6   I'd be willing to do it in a
7   shortened timeframe, if the
8   Board would like it sooner.  I
9   mean, I could do it in 15 or
10  30 days.
11  THE CHAIRMAN:
12      Okay.  Mr. Talbert?
13  MR. TALBERT:
14      Well, I'd like to think about
15      it.  I mean, I also want to
16      read the transcript just to
17      see how integrated this whole
18      day came across.  So I think
19      I'll reserve decision.  I'm
20      not volunteering to do it in
21      any shortened timeframe.
22  THE CHAIRMAN:
23      Okay.  One of the things that
24      I would like for you both to
25      address, if you do that, is

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

147

1   what I think is pretty
2   commonly understood as the
3   statutory purpose of the DSH
4   adjustment or add-on.  And how
5   you reconcile that statutory
6   purpose with your positions.
7   MR. TALBERT:
8       Okay.
9   THE CHAIRMAN:
10      Ms. Powell.
11  MS. POWELL:
12      Yes.  And I wonder if you
13      could submit post-hearing, Mr.
14      Lucas, a copy of Section
15      5111.01 of the Revised Code.
16  MR. LUCAS:
17      I would be glad to do that.
18  MS. POWELL:
19      Thank you.
20  THE CHAIRMAN:
21      All right.  We ordinarily
22      offer 45 days from today's
23      date in which to submit your
24      post-hearing briefs so that
25      you have plenty of time to get

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

148

1   the transcript of the record.
2   Will that be sufficient in
3   this case do you think?  It
4   sounds like it would be.
5   MR. TALBERT:
6       As sufficient here as it is in
7       any case.
8   THE CHAIRMAN:
9       All right.  So we will expect
10      those briefs 45 days from
11      today's date, and we do not
12      expect to have any additional
13      matter that has not been
14      either requested or authorized
15      by the Board in this hearing
16      today.  We do ask that you
17      -- any references that you
18      make to the testimony or to
19      the exhibits be very
20      specifically spelled out so
21      that we know exactly what
22      exhibit or testimony you're
23      talking about and where to
24      find those.
25  MR. LUCAS:

York Stenographic Services, Inc
34 North George St, York, PA 17401 - (717) 854-0077

149

1         Can I have one more special
2         request?
3  THE CHAIRMAN:
4         Certainly. You can try.
5  MR. LUCAS:
6         With respect to the
7         jurisdictional question...
8  THE CHAIRMAN:
9         Yes, sir.
10 MR. LUCAS:
11        ...our client, Akron General,
12        has a substantial amount of
13        money hanging in the balance
14        with respect to
15        Medicaid-eligible days.
16        They're clearly entitled to
17        it. It doesn't have anything
18        to do with any of these
19        issues, and I would hope that
20        the Board doesn't wait until
21        they make Decisions on these
22        things before we get a
23        Decision on the standing
24        issue, so that we can get the
25        hospital the money that

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

150

1         they're entitled to.
2  THE CHAIRMAN:
3         My expectation is that you
4         will get a Decision on all the
5         issues that have been raised
6         here at the same time. But,
7         you know, I am one member of
8         the Board, so that will be
9         something that the Board will
10        have to agree on.
11 MR. LUCAS:
12        Well, if there's any way to
13        expedite the jurisdictional
14        question, the client for
15        financial reasons has made it
16        very clear to use that they
17        desperately need the
18        substantial amount of money
19        they have. So -- have coming.
20        So if we can get the standing
21        issue done on that issue with
22        respect to the DSH, that would
23        be very helpful.
24 MR. TALBERT:
25        And just for whatever it's

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

151

1         worth, we certainly would not
2         have a problem with the Board
3         breaking that out and either
4         acknowledging or just, you
5         know, dispose of the matter by
6         acknowledging our request for
7         a withdrawal. So...
8  THE CHAIRMAN:
9         Right. And oftentimes that's
10        what we do is issue...
11 MR. TALBERT:
12        Yeah.
13 THE CHAIRMAN:
14        ...it's more common than not
15        that we do issue a
16        jurisdictional Decision prior
17        to a Decision on the merits.
18        But, you know, I don't
19        anticipate that there would be
20        a jurisdictional Decision
21        coming after that. I'll just
22        set that kind of an
23        expectation, and that's all
24        I'll characterize it as. Is
25        there anything further that we

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

152

1         need to discuss about what's
2         going to be presented? We
3         would like for you to also
4         present as part of your
5         post-hearing submission
6         proposed findings and
7         conclusions to the Board. If
8         there's nothing further, we
9         are adjourned. Thank you
10        both...
11 MR. LUCAS:
12        Thank you very much.
13 THE CHAIRMAN:
14        ...for your very concise...
15                  ***
16 [End of Proceedings]
17                  ***
18 aed

York Stenographic Services, Inc
34 North George St., York, PA 17401 - (717) 854-0077

203