Jersey Shore Medical Center v. Blue Cross and Blue Shield Association/Blue Cross and Blue Shield of New Jersey



October 30, 1998



## PROVIDER REIMBURSEMENT REVIEW BOARD HEARING DECISION

**PROVIDER -**

Jersey Shore Medical Center Neptune, New Jersey vs. INTERMEDIARY -

Blue Cross and Blue Shield Association/ Blue Cross and Blue Shield of New Jersey

**DATE OF HEARING** - August 26, 1998

ON-THE-RECORD

99-D4

Provider No. 31-0073

Cost Reporting Period Ended - December 31, 1992

**CASE NO.** 95-0907

### ISSUE:

Was the Intermediary's calculation of the Provider's disproportionate share hospital adjustment proper?

### STATEMENT OF THE CASE AND PROCEDURAL HISTORY:

**Jersey Shore Medical Center** ("Provider") is a 527 bed acute care hospital located in Neptune, New Jersey. As such, the Provider is reimbursed under Medicare's prospective payment system ("PPS") for inpatient hospital services furnished Medicare beneficiaries.[1]

For its cost reporting period ended December 31, 1992, the Provider qualified for a disproportionate share hospital ("DSH") adjustment to its PPS payments pursuant to 42 C.F.R. § 412.106. Blue Cross and Blue Shield of New Jersey ("Intermediary") determined the amount of the Provider's DSH adjustment using only Medicaid paid days in the numerator of the Medicaid proxy portion of the payment formula.[2]

On August 16, 1994, the Intermediary issued a Notice of Program Reimbursement for the subject cost reporting period, which reflected its DSH determination. On February 9, 1995, the Provider appealed the Intermediary's determination to the Provider Reimbursement Review Board ("Board") pursuant to 42 C.F.R. § 405.1835–.1841, and met the jurisdictional requirements of those regulations.

The Provider, in its appeal to the Board and in its Position Paper, argued in a broad sense that the Medicaid proxy should not be limited to Medicaid paid days but should include all Medicaid eligible days. However, in a letter dated November 13, 1997, the Provider supplemented its Position Paper and identified six specific categories of patient days that should be included in the numerator of the Medicaid proxy.[3] The Intermediary reviewed this information and disagreed with the Provider's assertion that: "[a]ll "charity care" days, as that term is used in the New Jersey State plan" should be included in the payment formula. The five categories of patient days that were not disputed are as follows:[4] All days for which a patient was both Medicaid eligible

and Medicare Part B eligible. All days for which Medicaid denied payment, if that denial was based on grounds other than eligibility. All days related to Medicaid appeals currently pending in the New Jersey Fair Hearing process. All days for which a patient was both Medicaid eligible and Medicare Part A eligible, but for which the patient was not entitled to Medicare Part A benefits, because of exhaustion of such benefits or any other reason, or for which Medicare Part A benefits were not paid.[5] All other "uncompensated care" days, as that term is used in the New Jersey State plan.

In addition, in Exhibit P-8 at 2, the Provider listed eleven categories of patient days it believed should be included in the numerator of the Medicaid proxy. The Intermediary reviewed this information and disagreed with the Provider's assertion that: "Medicare Part A with Medicaid" patient days should be included in the DSH formula.[6] The other ten categories of patient days that are not in dispute are as follows: Medicare Part B with Medicaid. Medicaid Claims Paid after the Cut-Off as of December 31, 1996. Out of State. Claims Pending at a Fair Hearing Decision. Medicare Cross-Over Claims (Type 14). Medicaid Denied Days (Claim Type 14). Medicaid Denied Days (Claim Type 01). HMO/Medicaid Days. Other Primary Insurance with Medicaid TPL.

Accordingly, the Medicaid patient days in controversy in this case are: (1) those days pertaining to patients that have exhausted their Medicare Part A benefits, and (2) those days pertaining to charity care under the New Jersey State plan. The estimated amount of Medicare reimbursement in controversy exceeds $10,000.

The Provider was represented by Joseph D. Glazer, Esquire, of Reed Smith Shaw & McClay LLP. The Intermediary was represented by Bernard M. Talbert, Esquire, Associate Counsel, Blue Cross and Blue Shield Association.

## Patients Who Have Exhausted Medicare Part A Benefits

### PROVIDER'S CONTENTIONS:

The Provider contends that patient days related to Medicaid payments for dual-eligible individuals should be included in the numerator of the Medicaid proxy. Specifically, the Provider asserts that in those instances where, during a patient stay, a patient eligible for both Medicare Part A and Medicaid exhausts his or her benefits, Medicare stops paying for the patient's outlier days and Medicaid begins to reimburse the hospital for those costs. The Provider asserts that in these instances the patient is no longer entitled to Medicare benefits and the days related to these costs should therefore be included in the Medicaid proxy.[7]

The Provider asserts that this contention is based upon the articulated principles of the DSH adjustment. The Provider cites 42 U.S.C § 1395ww(d)(5)(F)(vi)(II) as expressly requiring the inclusion of all days in the Medicaid proxy for which patients were eligible for medical assistance under a State Medicaid plan, which would include the dual-eligible days paid by Medicaid, as follows:

> the fraction (expressed as a percentage), the numerator of which is the number of the

hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter [the Medicaid program], but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

The Provider also cites, in part, HCFA Ruling 97-2, which changed the Secretary's interpretation of what days should be included in the Medicaid proxy, as follows:

> [u]nder the new interpretation, the Medicare disproportionate share adjustment under the hospital inpatient prospective payment system will be calculated to include all inpatient hospital days of service for patients who were eligible on that day for medical assistance under a State Medicaid plan in the Medicaid fraction, whether or not the hospital received payment for those inpatient hospital services.

HCFA Ruling 97-2.[8]

The Provider notes that according to HCFA Ruling 97-2, the Secretary of Health and Human Services' ("Secretary") agrees that all days for patients eligible for medical assistance under a State Medicaid plan should be included in a hospital's DSH calculation. Moreover, the ruling is applied prospectively to cost reports that are settled after the date it was issued (February 27, 1997) and to cost reports that have been settled prior to the effective date, but for which a hospital has a proper appeal pending on the issue, as does the Provider.

Also regarding the articulated principles of the DSH adjustment, the Provider cites an instructional memorandum issued by the Health Care Financing Administration ("HCFA") on June 12, 1997, which explains how HCFA Ruling 97-2 should be implemented.[9] The Provider asserts that this memorandum further clarifies the Secretary's interpretation of the days to be included in the Medicaid proxy, as follows:

> [c]onsistent with the Courts of Appeals decisions on the issue of Medicaid days, the HCFA Ruling 97-2 was meant to be inclusive, rather than exclusive. This means that, in calculating the number of Medicaid days, fiscal intermediaries should ask themselves, "Was this person a Medicaid (Title XIX) beneficiary on that day of service?" If the answer is "yes," the day counts in the Medicare disproportionate share adjustment calculation. This does not mean that Title XIX had to be responsible for payment for any particular services. It means that the

person had to have been determined by a State agency to be eligible for Federally-funded medical assistance for any one of the services covered under the State Medicaid Title XIX plan (even if no Medicaid payment is made for inpatient hospital services or any other covered service). Any examples of days to be counted given in the HCFA Ruling or in HCFA instructions should not be construed as an all-inclusive list.

HCFA Memorandum, FKA-31, June 12, 1997.

Finally, the Provider contends that a letter issued by HCFA on February 29, 1996, also supports the fact that days paid by Medicaid after Medicare Part A benefits are exhausted should be included in the DSH calculation. In that letter, HCFA instructs the Intermediary that in situations where Medicare is the primary payor and Medicaid is the secondary payer, the days related to a patient's stay should be prorated between the two agencies. As an example, HCFA states that "if a stay of 10 days costs $10,000 and Medicare paid $3,000 and Medicaid paid $7,000, then Medicare would be credited with 3 days and Medicaid would be credited with 7 days." HCFA Letter, FKA-31, February 29, 1996.[10]

**INTERMEDIARY'S CONTENTIONS:**

The Intermediary contends that the Provider's fundamental argument that Medicaid pays for patient days after Medicare Part A benefits are exhausted is wrong.[11] The Intermediary asserts that these days are, in fact, paid by Medicare and must be excluded from the DSH calculation in accordance with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), which states, in part,

> the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter [the Medicaid program], but who were not entitled to benefits under part A of this subchapter, and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II).

The Intermediary asserts that there is a maximum number of days under Medicare Part A which are covered for a Medicare beneficiary. When Part A eligibility is exhausted in the course of a hospital admission, Medicare Part B provides coverage for certain ancillary services. Also, under PPS the Medicare program pays the full diagnostic related group ("DRG") payment for an admission even if technically, the day maximum is reached during the course of the stay. Therefore, Medicare Part A makes payment on behalf

of a beneficiary's days because the DRG/operating cost payment is not factored down even if covered days are exhausted before discharge.

The Intermediary concludes that in order to be included in the Medicaid proxy, days in which a patient is entitled to Medicaid can not be paid by Medicare Part A, and that condition is not met in this instance.

### Charity Care Program Days Under the New Jersey State Plan

**PROVIDER'S CONTENTIONS :**

The Provider contends that days related to patients who are eligible for New Jersey's Charity Care program should be included in the DSH calculation since they meet the relevant statutory requirements.[12] Pursuant to 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), patient days included in the numerator of the Medicaid proxy are defined in terms of whether the patient was "eligible for medical assistance under a State plan approved under subchapter XIX of this chapter."[13] Respectively, the Provider asserts that the Charity Care program at issue generally provides "medical assistance," or payment for inpatient hospital services, under the New Jersey State Medicaid plan for certain indigent individuals who are not eligible for Medicaid. If a patient meets certain specific guidelines and does not get charged by a hospital for its services, or the patient pays a reduced amount of the hospital's charges, the Charity Care program pays the hospital for its unreimbursed costs.[14] Patient eligibility criteria and standards for hospital reimbursement are both detailed in the State plan.[15] The Provider emphasizes that the statutory language includes days in the DSH calculation that pertain to patients eligible under a State plan for Medicaid, as quoted above, and not specifically eligible for Medicaid.

The Provider asserts that New Jersey's Charity Care program is also an essential part of the State satisfying its statutory obligation regarding payments to DSH hospitals.[16] Federal law requires that every State have a federally approved Medicaid plan that details, among other things, the State's methodology for paying for inpatient hospital services. 42 U.S.C. § 1396a. Although such Medicaid plans are formulated by each State, the plans must comply with the federal Medicaid statute and be approved in order to receive federal funds. 42 U.S.C. § 1396a(a).[17] Among the statutory requirements, State plans must satisfy certain standards related to disproportionate share hospitals. Specifically, each State's Medicaid plan must provide payment rates to hospitals that take into account the situation of hospitals that serve a disproportionate number of low income patients with special needs. 42 U.S.C. § 1396a(a)(13). The Provider submits that the purpose of the DSH adjustment (to provide additional reimbursement to those hospitals that serve a disproportionately large percentage of low income patients), is fully served only if Charity Care patients are included in the DSH calculation.[18] The Provider adds that many patients who receive Charity Care are patients who would be eligible for Medicaid except for the fact that their income or resources are too high, based on Medicaid limits. Accordingly, the Provider argues that the Charity Care program is essentially an

extension of the Medicaid program; an extension fully sanctioned by the federal government, subject to extensive federal review through the State plan approval process, and paid for with both State Medicaid dollars and federal matching funds.

Finally, the Provider contends that even if all days related to Charity Care patients are not included in the DSH calculation, there are some Charity Care patients that were actually eligible for the standard Medicaid program. Whether through inadvertence or inability to determine eligibility at the relevant time, these patients' expenses were reimbursed by the Charity Care program rather than the standard Medicaid program. At the very least, all patient days related to such patients should be included in the Provider's DSH calculation.

**INTERMEDIARY'S CONTENTIONS :**

The Intermediary contends that the Charity Care days at issue may not be included in the Provider's DSH calculation based upon a straight forward reading of the pertinent regulation. At 42 C.F.R. § 412.106(b)(4), the regulations specifically include patient days in the Medicaid proxy that are attributable to patients "entitled to Medicaid." The Provider's own description of Charity Care patients clearly recognizes that they are not eligible for Medicaid coverage. See e.g. Provider Letter Dated November 13, 1997 at 2.

The Intermediary also contends that the Provider's arguments for including Charity Care patient days in the Medicaid proxy are based upon a perceived conflict between the pertinent regulations and the pertinent statute. As noted above, 42 C.F.R. § 412.106(b)(4) includes patient days in the DSH calculation attributable to patients "entitled to Medicaid." The pertinent statute, however, references patient days attributable to patients "eligible for medical assistance under a State plan." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The Provider argues that in New Jersey the definition "entitled to Medicaid" is broadened by patients who receive some level of care under a State plan, albeit, not specifically the Medicaid program. However, an analysis of the regulation does not support that definition.

Finally, the Intermediary contends that the Board is bound by regulations and, therefore, may affirm its rejection of the Charity Care days from the Provider's DSH calculation based upon 42 C.F.R. § 412.106(b)(4). However, the Intermediary also asserts that the Board may not be the proper forum to address this matter, and may consider expediting it for judicial review. 42 C.F.R. § 405.1842.

**CITATION OF LAW, REGULATIONS AND PROGRAM INSTRUCTIONS :**

1.  Law - 42 U.S.C. : § 1395ww(d)(5)(F)(vi)(II) - PPS Transition Period; DRG Classification System; Exceptions and Adjustments to PPS § 1396a et seq. - State Plans for Medical Assistance

2.  Regulations - 42 C.F.R. : § 405.1835-.1841 - Board Jurisdiction § 405.1842 - Expediting Board Proceedings § 406.10(b)(2) - Beginning and End of Entitlement § 412.106 - Special Treatment: Hospitals that Serve a Disproportionate Share of Low Income

Copyright (c) West Group 1999. All Rights Reserved.                    6

Patients § 412.106(b)(4) - Determination of a Hospital's Disproportionate Patient Percentage - Second Computation § 430.10 - The State Plan

3. <u>Other</u> : HCFA Ruling 97-2. HCFA Letter, FKA-31, February 29, 1996. HCFA Memorandum, FKA-31, June 12, 1997.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND DISCUSSION :

The Board, after consideration of the facts, parties' contentions, and evidence presented, finds and concludes as follows:

### Patients Who Have Exhausted Medicare Part A Benefits

The Board finds that the Intermediary refused to include patient days attributable to dual eligible patients in the numerator of the Provider's Medicaid proxy. These days pertain to individuals who exhausted their Medicare Part A benefits during an inpatient stay. According to the Provider, Medicare stopped paying for the patients' outlier days in these instances and the New Jersey State Medicaid program began to pay the hospitals. The Provider argues that the outlier days not covered by Medicare but paid by Medicaid should be included in the DSH formula.

The Board agrees with the Provider. The Board finds that where a state's approved Medicaid program assumes responsibility for payment of a provider's inpatient charges that the days associated with those charges are, in fact, "Medicaid days." A fundamental characteristic of health care cost finding, including that employed in the Medicare cost reporting process, requires patient days to be assigned to the program, insurer, or private pay patient responsible for a provider's charges.

The Board also finds that the subject days must be included in the Provider's Medicaid proxy in order for a "correct" DSH adjustment to be determined. That is, in order for the DSH formula to produce results or payment levels anticipated by statute, definitive data must be used. In this regard, the Medicaid proxy must reflect all patient days associated with health care costs and benefits attributable to Medicaid patients that are not paid by Medicare. The Board finds that the days at issue precisely meet these requirements, and their exclusion from the Medicaid proxy results in an understatement of the Provider's DSH adjustment.

The Board rejects the Intermediary's argument that the subject days can not be included in the Medicaid proxy because Medicare Part A paid 100 percent of the applicable DRGs; that is, even though the patients had exhausted Part A benefits during their admissions, DRG reimbursement was not prorated downward. The Board, however, finds the patient days at issue to be outside the DRG payments made by the Intermediary as well as any day outlier payments that may also have been made. As stipulated by the Provider, the days at issue in this case consist of outlier days which, by definition, are outside of DRG reimbursement. Moreover, they are days that were not reimbursed through Medicare's outlier mechanism because Part A benefits had been exhausted.

The Board finds that its position regarding this matter is consistent with the enabling statute and regulations. Controlling

authorities at 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) and 42 C.F.R. § 412.106(b)(4) require days furnished to patients eligible for Medicaid but not entitled to Medicare Part A to be included in the Medicaid proxy. The Board concludes that this exact condition exists in this case. Once the patients had exhausted their Part A benefits they were no longer entitled to have Medicare Part A pay for their inpatient hospital health care costs.[19] Concurrently, these same patients became eligible for Medicaid benefits.

Finally, the Board finds that it is not essential to this case that the New Jersey State Medicaid program had actually reimbursed the Provider for the subject outlier days. Consistent with HCFA Ruling 97-2, it is not necessary for a hospital to have received payment in order to include patient days in the Medicaid proxy; it is only necessary for the patient to have been eligible for medical assistance under the State's Medicaid plan.

### Charity Care Program Days Under the New Jersey State Plan

The Board finds that the Intermediary refused to include Charity Care program days in the numerator of the Provider's Medicaid proxy because it concluded that these days do not pertain to patients "entitled to Medicaid" as required by 42 C.F.R. § 412.106(b)(4). In support of its position the Intermediary cites the Provider's general description of the Charity Care program as providing medical assistance under the New Jersey State plan for certain indigent individuals who do not meet the State's Medicaid eligibility requirements.

The Board, however, finds that the subject Charity Care days clearly meet the statutory definition of patient days included in the numerator of the Medicaid proxy and, therefore, should be included in the Provider's DSH calculation. The controlling authority at 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) defines patient days included in the numerator of the Medicaid proxy as those days pertaining to patients "eligible for medical assistance under a State plan approved under subchapter XIX of this chapter." In this regard, the Board finds that the enabling New Jersey State plan was approved under Title XIX of the Social Security Act as required by the statute, and contained the subject Charity Care program which provided medical assistance to eligible persons.

The Board rejects the Intermediary's argument that the Charity Care patients at issue in this case were not entitled to Medicaid. Essentially, the Board finds that any person qualifying for/and receiving medical assistance under an approved State plan is, by virtue, entitled to Medicaid. The Board cites 42 C.F.R. § 430.10, which states in part:

> [t]he State plan is a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program. . .

42 C.F.R. § 430.10.

The Board understands that the New Jersey State plan contains different eligibility criteria for Charity Care program patients than it does for its other, more typical, program patients. Moreover, the

Board believes this difference is the basis for the Intermediary's argument regarding Charity Care patient entitlement, and the Provider's statement that Charity Care patients are not eligible for Medicaid. In effect, both the Intermediary and the Provider chose to define Medicaid as a type of subset of medical services within the broader context of the State plan. The Board, however, finds no authoritative basis for this distinction. The Board finds that once a State plan is approved, the Federal Government provides matching funds for all medical service costs provided for in that plan, including costs attributable to the subject Charity Care program. The Board notes the Provider's argument that the State did, in fact, receive Federal matching funds for the costs of the Charity Care program days at issue, and that this argument was not disputed by the Intermediary. Moreover, the Board notes HCFA Memorandum, FKA-31, dated June 12, 1997, which explains that Federal funding is an important factor in determining whether or not a patient day is included in the Medicaid proxy. The memorandum states, in part:

> [c]onsistent with the Courts of Appeals decisions on the issue of Medicaid days, the HCFA Ruling 97-2 was meant to be inclusive, rather than exclusive. This means that, in calculating the number of Medicaid days, fiscal intermediaries should ask themselves, "Was this person a Medicaid (Title XIX) beneficiary on that day of service?" If the answer is "yes," the day counts in the Medicare disproportionate share adjustment calculation. This does not mean that Title XIX had to be responsible for payment for any particular services. <u>It means that the person had to have been determined by a State agency to be eligible for Federally-funded medical assistance for any one of the services covered under the State Medicaid Title XIX plan</u> . . .

HCFA Memorandum, FKA-31, June 12, 1997 (emphasis added).

Finally, the Board, having concluded that a State plan necessarily defines a State's Medicaid program, finds no basis for the Intermediary's proposition that the Charity Care days issue may best be suited for expedited judicial review. The Board finds that the provision of 42 C.F.R. § 412.106(b)(4), which bases the DSH calculation on patient days attributable to patients "entitled to Medicaid" is essentially synonymous with 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), which references patient days attributable to patients "eligible for medical assistance under a State plan." The Board notes that on February 27, 1997, HCFA issued Ruling 97-2 to clarify a specific aspect of the DSH calculation. The Board believes this Ruling supports its position since the Ruling apparently uses the aforementioned terms interchangeably.

### DECISION AND ORDER :

### Patients Who Have Exhausted Medicare Part A Benefits

The Intermediary should confirm the number of outlier days of service furnished by the Provider to dual eligible patients after their Medicare Part A benefits had exhausted, and which were eligible for reimbursement under the State's Medicaid plan, and include this number of days in the Provider's DSH calculation. The Intermediary's refusal to include these days in the numerator portion of the Provider's Medicaid proxy is reversed.

### Charity Care Program Days Under the New Jersey State Plan

The Intermediary should confirm the number of patient days of service furnished by the Provider to patients eligible for medical assistance under the State's Charity Care program, and include this number of days in the Provider's DSH calculation. The Intermediary's refusal to include these days in the numerator portion of the Provider's Medicaid proxy is reversed.

### Board Members Participating:

Irvin W. Kues

James G. Sleep

Henry C. Wessman, Esquire

Martin W. Hoover, Jr., Esquire

Charles R. Barker

FOR THE BOARD:

OCT 30 1998

Irvin W. Kues

Chairman

---

[1] Intermediary's Position Paper at 1.

[2] The term "Medicaid proxy" is used to refer to the portion of the DSH payment formula found at 42 C.F.R. § 412.106(b)(4). Intermediary's Position Paper at 3.

[3] Provider Letter Dated November 13, 1997 at 16.

[4] Intermediary's Supplemental Position Paper at 2.

[5] Note: A variation of these days are actually in dispute. See next paragraph.

[6] Intermediary's Supplemental Position Paper at 3.

[7] Provider's Supplemental Position Paper at 7.

[8] Provider's Supplemental Position Paper at Exhibit A.

[9] Provider's Supplemental Position Paper at Exhibit B.

[10] Provider's Supplemental Position Paper at Exhibit D.

[11] Intermediary's Supplemental Position Paper at 4.

[12] Provider's Supplemental Position Paper at 9.

[13] Provider's Supplemental Position Paper at 14.

[14] Provider's Supplemental Position Paper at 11.

[15] See Provider's Supplemental Position Paper at Exhibit F at 69–73, § 3.31.

[16] Provider's Supplemental Position Paper at 14.

[17] Provider's Supplemental Position Paper at 9.

[8] Provider's Supplemental Position Paper at 15.

[19] The Board distinguishes the term "entitled to Medicare Part A" as used in 42 C.F.R. § 412.106(b)(4) from the term "entitlement" as that term is used, for example, in 42 C.F.R. § 406.10(b)(2). The Board does not believe the referenced word "entitled" used in 42 C.F.R. § 412.106(b)(4) is intended to reflect the absolute end of an individual's health insurance benefits under Medicare.

Copyright (c) West Group 1999. All Rights Reserved.   11