IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASHTABULA COUNTY MEDICAL CENTER, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:05CV02365 (RWR) |
| MICHAEL O. LEAVITT, Secretary, United States Department of Health and Human Services, | ) ) ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant, Michael O. Leavitt, Secretary of the United States Department of Health and Human Services, hereby moves for summary judgment because there is no genuine issue as to any material fact and Defendant is entitled to judgment as a matter of law.

In support of this motion, defendant respectfully submits the attached memorandum, statement of material facts not in genuine dispute, response to plaintiffs' statement of facts, and a proposed order. The Certified Administrative Record has previously been filed with the Court.

Respectfully submitted,

_____/s/_____
KENNETH L. WAINSTEIN
United States Attorney
D.C. Bar No. 451058

_____ /s/ _____
MEGAN L. ROSE
Assistant United States Attorney
N.C. Bar No. 28639
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
(202) 514-7220 / FAX: (202) 514-8780


DAVID HOSKINS
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
330 Independence Ave., S.W., Room 5309
Washington, D.C. 20201


OF COUNSEL:

PAULA M. STANNARD
Acting General Counsel

KATHLEEN H. MCGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of Health
and Human Services

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASHTABULA COUNTY MEDICAL CENTER, et al. | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:05CV02365 (RWR) |
| MICHAEL O. LEAVITT, Secretary, United States Department of Health and Human Services, | ) ) ) ) | |
| Defendant. | ) ) ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs, Medicare-participating hospitals located in the State of Ohio, seek additional

Medicare payment for services furnished to Medicare beneficiaries, and in doing so, challenge an

interpretation of the Medicare statute by the Secretary of the United States Department of Health

and Human Services.  Though plaintiffs contend that the Secretary's interpretation of the

statutory provision at issue conflicts with the plain and unambiguous language of the statute, this

is not the case.  The Secretary's interpretation of the statute is reasonable and is entitled to

deference; in addition, the Secretary's final decision at issue in this case is reasonable and is

supported by substantial evidence.

This case involves the complex interaction between provisions of the Medicare and

Medicaid statutes.  The Medicare statutory provision at issue provides additional Medicare

payments to hospitals that serve a disproportionate share of low income patients, as determined

in accordance with the statute and implementing regulations.  The statute requires the Secretary

to count, among other things, patient days of patients who are "eligible for medical assistance under a State plan approved under title XIX [of the Social Security Act, i.e., the Medicaid statute]." Plaintiffs argue that this provision unambiguously requires the Secretary to count patient days of patients who are not so entitled, but who receive charity care from Ohio hospitals (pursuant to the State of Ohio's Hospital Care Assurance Program ("HCAP")). It is uncontested that such individuals do not meet the eligibility requirements for Medicaid benefits set forth in the Medicaid statute and the State of Ohio's title XIX (Medicaid) State plan. The short answer to plaintiffs' argument is that the Secretary has reasonably interpreted the statutory phrase "eligible for medical assistance under a State plan approved under title XIX" to mean eligible for Medicaid. This conclusion is evident from the text of the statute, the Secretary's regulations (including those subsequently ratified by Congress), and from decisions of several United States Courts of Appeals.

Plaintiffs concede that the patient days at issue in this case are attributable to patients who are not eligible for Medicaid, but they nevertheless attempt to pigeonhole the patient days at issue into the statute by arguing that because the Ohio State Medicaid plan conditions the eligibility of hospitals for Medicaid DSH payments, the recipients of the free care are somehow "eligible for medical assistance under the State plan." Plaintiffs' logic is faulty, however, and their alternative interpretation of statutory terms is clearly wrong (in any event, plaintiffs' alternative interpretation is not unambiguously compelled by the statute). Plaintiffs' arguments fail to demonstrate that the Secretary's interpretation of the statute is unreasonable. Indeed, the Social Security Act provisions at issue here do not unambiguously require the counting of the patient days at issue in this case, and this Court should defer to the Secretary's reasonable interpretation:

in determining the numerator of the Medicaid fraction of the Medicare DSH calculation, the

Secretary can reasonably exclude patient days of patients who are not eligible for Medicaid.


## BACKGROUND

A.    **Statutory and Regulatory Background**

1.    **Medicare and the DSH Adjustment.**

This case arises under Part A of the Medicare program, which provides payments for

inpatient hospital services and related care.  42 U.S.C. §§ 1395c et seq.  Since 1983, the

operating costs of inpatient hospital services have been paid primarily through the Prospective

Payment System (PPS), 42 U.S.C. § 1395ww(d).  Generally speaking, an individual hospital's

PPS payment is based on prospectively-determined national rates for each discharge, rather than

on the actual operating costs incurred by the hospital.  42 U.S.C. § 1395ww(d)(1)-(4).  However,

the PPS contains a number of provisions that adjust payments on the basis of hospital-specific

factors.  See, e.g., id. § 1395ww(d)(5).  This case involves one of those hospital-specific

adjustments.

In 1986, Congress enacted a provision known as the Medicare disproportionate share

hospital ("DSH") adjustment.  Consolidated Omnibus Budget Reconciliation Act of 1985, Pub.

L. No. 99-272, § 9105, 100 Stat. 82 (1986).[1]  This provision requires the Secretary of the United

States Department of Health and Human Services to provide increased PPS payments to

---

[1] The 1986 DSH provision at issue here was initially set to expire in 1988.  See Pub. L.
No. 99-272 § 9105(a), 100 Stat. 82.  Congress provided several limited extensions, then in 1990
extended the provision indefinitely.  See  Pub. L. No. 99-509 § 9306(c), 100 Stat. 1874, 1995
(1986 extension until 1989); Pub. L. No. 100-203 § 4003(c), 101 Stat. 1330-46 (1987 extension
until 1990); Pub. L. No. 100-647 § 8401, 102 Stat. 3342, 3798 (1988 extension until 1995); Pub.
L. No. 101-508 § 4002(b)(3), 104 Stat. 1388-32 (indefinite extension).

hospitals that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I). Congress enacted this provision because it determined that such hospitals generally incur higher per-case Medicare costs. See, e.g., H.R. Rep. No. 99-241 at 16 (1986), reprinted in 1986 U.S.C.C.A.N. 579, 594.

Whether a hospital qualifies for the Medicare DSH adjustment, and how large an adjustment it receives if it does qualify, depend primarily on the hospital's "disproportionate patient percentage." See 42 U.S.C. § 1395ww(d)(5)(F)(v). Congress provided a statutory definition of "disproportionate patient percentage," which is codified at 42 U.S.C. § 1395ww(d)(5)(F)(vi). The definition of "disproportionate patient percentage" consists of two components. The first component, not relevant to this case, is known as the "Medicare fraction." 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). The second component, which is at the heart of this case, uses Medicaid eligibility as a proxy for low income. Known as the "Medicaid fraction," it is defined as:

> the fraction (expressed as a percentage), the numerator of which is the number of the hospital's patient days for such period which consist of *patients who (for such days) were eligible for medical assistance under a State plan approved under subchapter XIX of this chapter* [i.e., the Medicaid program], but who were not entitled to benefits under part A of this subchapter [i.e., the Medicare program], and the denominator of which is the total number of the hospital's patient days for such period.

42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) (emphasis added). Generally under this equation, a hospital's Medicare DSH adjustment grows as the count of patient days in the numerator of the Medicaid fraction increases. See id.; 42 U.S.C. § 1395ww(d)(5)(F)(vii)- (xiii).

In a recently enacted statute, Congress clarified the meaning of the phrase "eligible for medical assistance under a State plan approved under [title] XIX" by adding the following language after and below the language quoted above:

-4-

> In determining under subclause (II) the number of the hospital's patient days for
> such period which consist of patients who (for such days) were eligible for
> medical assistance under a State plan approved under title XIX, the Secretary
> may, to the extent and for the period the Secretary determines appropriate, include
> patient days of patients not so eligible but who are regarded as such because they
> receive benefits under a demonstration project approved under title XI.

Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5002, 120 Stat. 4, 31 (February 8, 2006)

(codified in part at 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II)) ("DRA").  This amendment specifically

addresses the scope of the Secretary's authority to include (or exclude), in determining the

numerator of the Medicaid fraction of the Medicare DSH calculation, patient days of patients not

eligible for medical assistance under a State plan but who receive benefits under a demonstration

project approved under title XI of the Social Security Act.

###               2.        The Medicaid Program

Medicaid (as opposed to Medicare) is a cooperative federal-state program to provide

medical assistance to low-income persons.  See 42 U.S.C. §§ 1396 - 1396v; 42 C.F.R. §§ 430.0

et seq. (2002) (implementing regulations).  In order to participate in the Medicaid program, a

State must submit a plan for medical assistance, known as the "State plan," to the Centers for

Medicare & Medicaid Services ("CMS") (formerly known as the Health Care Financing

Administration ("HCFA")), which administers Medicaid on behalf of the Secretary.  42 U.S.C. §

1396a.  The State plan specifies, inter alia, the categories of individuals who will receive medical

assistance under the plan and the specific kinds of medical care and services that will be covered.

If the plan is approved by the Secretary, the State is thereafter eligible to be reimbursed by the

federal government for a specified percentage (the "Federal medical assistance percentage") of

the amounts "expended . . . as medical assistance under the State plan."  Id. §§ 1396b(a)(1),

1396d(b).  This federal reimbursement is known as federal financial participation, or "FFP."

The Medicaid statute establishes a number of requirements that must be met in order for a State plan to be approved.  See generally 42 U.S.C. § 1396a(a)(1)-(65).  One such requirement is that a State plan must make medical assistance available to certain "categorically needy" persons. Id. § 1396a(a)(10)(A)(i).  At the State's option, the plan may also make medical assistance available to "medically needy" persons.  Id. § 1396a(a)(10)(C).

The Medicaid statute sets forth a number of requirements, including income and resource limitations, that apply to individuals who wish to receive medical assistance under the State plan. See, e.g. 42 U.S.C. §§ 1396a(a)(10)(A)(i)(IV), (VI), (VII); see also id. 1396b(f).  Individuals who do not meet the applicable requirements, either by reason of their income levels or for other reasons, are not eligible for medical assistance under the State plan.

### 3.    Medicaid DSH Payments.

In addition to the medical assistance the State plan must provide to Medicaid beneficiaries, a State plan must also provide for additional payments to hospitals that treat a disproportionate share of low-income patients with special needs.  42 U.S.C. § 1396a(a)(13)(A). The Medicaid DSH payment is separate and distinct from the Medicare DSH payment.  "The purpose of Medicaid DSH payment adjustment is to assist those facilities with high volumes of Medicaid patients in meeting the costs of providing care to the uninsured patients that they serve, since these facilities are unlikely to have large numbers of privately insured patients through which to offset their operating loses on the uninsured."  H. R. Conf.  Rpt. 103-111, at 211 (1993), reprinted in 1993 U.S.C.C.A.N. 378, 538.

In order to ensure that State Medicaid programs take into account the situation of hospitals that serve a disproportionate share of low-income patients with special needs, Congress in 1981 added to the Social Security Act a general mandate that State plans provide for payment

rates for hospital services that take into account the situation of such hospitals.  42 U.S.C. §

1396a(a)(13)(A).  In 1987 and 1988, Congress added specific requirements for states to comply

with this general mandate through higher payments to designated hospitals.  42 U.S.C. § 1396r-4;

Pub. L. No. 100-203, § 4112, as amended by Pub. L. No. 100-60, § 411(k).  In 1991, Congress

repealed statutory language that precluded the Secretary from limiting state DSH payments, 42

U.S.C. § 1396a(h), and directed the Secretary to determine state-specific limits on federal

funding for Medicaid DSH payments for each fiscal year, using a statutory formula.  42 U.S.C. §

1396r-4(f); Pub. L. No. 102-234, § 3.

In 1993, Congress further restricted Medicaid DSH payments by imposing  hospital-

specific limits on those payments.  42 U.S.C. § 1396r-4(g), Pub. L. No. 103-66, § 13621.  This

provision limits the amount of Medicaid DSH payments to a specific hospital to

> the costs incurred during the year of furnishing hospital services (as determined by
> the Secretary and net of payments under this title, other than under this section,
> and by uninsured patients) by the hospital to individuals who either are eligible for
> medical assistance under the State plan or have no health insurance (or other
> source of third party coverage) for services provided during the year.

42 U.S.C. § 1396r-4(g)(1)(A).  In other words, a Medicaid DSH payment may not exceed the

hospital's Medicaid shortfall (the amount by which the costs of treating Medicaid patients

exceeds hospital's Medicaid payments) plus the cost of treating the uninsured.

### 4.    Administrative Appeals Process.

Fiscal intermediaries act as the agents of the Secretary in reviewing annual Medicare cost

reports submitted by hospitals and in administering Medicare payments to the hospitals.  In

administering payments, an intermediary reviews the hospital's cost report and issues a "Notice

of Program Reimbursement" ("NPR"), which identifies the amount the hospital will be paid by

Medicare for that cost report year.  If a provider disagrees with the determination, and if the

-7-

disputed amount exceeds $10,000, the provider may request an administrative hearing before the

Provider Reimbursement Review Board ("PRRB" or "Board"). 42 U.S.C. § 1395oo(a). The

Medicare statute also provides for "expedited judicial review" ("EJR") in lieu of an

administrative hearing, where the Board determines that it lacks authority to decide a question of

law presented by an administrative appeal. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842.

The PRRB's decision is final, unless the Secretary, acting through the CMS Administrator,

within 60 days, reverses, affirms, or modifies the decision. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R.

§§ 405.1871(b), 405.1875(a). Providers may obtain judicial review of a "final decision" of the

PRRB, or the Secretary, if the Secretary exercises his right of review. 42 U.S.C. § 1395oo(f)(1).

### B.    Factual Background.

Plaintiffs are five hospitals located in the State of Ohio, each of which seeks additional

Medicare payment for hospital inpatient services furnished during individual hospital cost years.

Complaint ¶ 1; Certified Administrative Record ("A.R.") at 15. In determining the amount of

Medicare payment for plaintiff hospitals for the fiscal years at issue in this case, the fiscal

intermediary did not count, in the numerator of the Medicaid fraction of the Medicare DSH

calculation, patient days of patients who received charity care from plaintiffs (pursuant to HCAP)

but who are not eligible for Medicaid.

For the time period at issue in this case, the State of Ohio had a State plan for medical

assistance approved by the Secretary under Title XIX of the Social Security Act. Complaint

¶ 23; Answer ¶ 23. Under the terms of the State plan, Ohio makes an additional payment to

hospitals that serve a disproportionate share of patients with special needs. 42 U.S.C. §

1396a(a)(13)(A); 42 U.S.C. § 1396r-4. The Ohio State plan refers to this system as the Hospital

Care Assurance Program ("HCAP"). A.R. at 12.

Section 5112.17(B) of the Ohio Revised State code explicitly states that hospitals receiving Medicaid DSH payments must provide a minimal amount of care free of charge to patients who "are not recipients of the medical assistance program, and whose income is at or below the federal poverty guidelines." Id. Section 5111.01 of the Ohio Revised State Code defines "medical assistance program" or "medicaid" as "the program that is authorized by this chapter and provided by the department of job and family services under this chapter, Title XIX of the 'Social Security Act,' 79 Stat 286 (1965), 42 U.S.C.A. § 1396, as amended, and the waivers of Title XIX requirements granted to the department by the health care financing administration of the United States department of health and human services." Plaintiffs acknowledge that beneficiaries of HCAP are not eligible for "traditional" Medicaid (to use plaintiffs' terminology). See, e.g., A.R. at 17.

Plaintiffs filed cost reports for each of the individual cost reporting periods at issue in this case, and the fiscal intermediaries issued NPRs for each of the cost reports. A.R. at 1707-1873. For the appeals in this case, the PRRB found in favor of plaintiffs. A.R. at 50-55. The CMS Administrator subsequently reversed. A.R. at 2-14. The CMS Administrator found that the Secretary had reasonably interpreted the phrase "eligible for medical assistance under a State plan approved under [Title XIX]" to have the same meaning in 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II) as it does in Title XIX. A.R. 12-13. The CMS Administrator further found that the individuals at issue in this case were not eligible for medical assistance under the Ohio state plan. Id. (stating in part, "A review of the case shows that the days at issue are related to individuals that are specifically identified as not eligible for medical assistance under an approved Title XIX State plan."). Plaintiffs subsequently filed the instant action.

## ARGUMENT

### I.    STANDARD OF REVIEW.

Summary judgment is appropriate where "there is no genuine issue of material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Summary judgment is properly regarded "not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy and inexpensive determination of every action.'" Celetox Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The Administrative Procedure Act standard of review, 5 U.S.C. § 706(2)(A) and (E), provides that agency action, findings, and conclusions can be set aside only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 413-15 (1971); Memorial Hospital/Adair County Health Center, Inc. v. Bowen, 829 F.2d at 111, 116-17 (D.C. Cir. 1987).

 Courts have consistently held that the APA establishes a narrow standard of review. Under the arbitrary and capricious standard, an agency action may be invalidated only if it is not rational or not based on a consideration of relevant factors. FCC v. National Citizens Comm. for Broadcasting, 436 U.S. 775, 803 (1978); see also Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Ins. Co., 463 U.S. 29, 43 (1983). Under the substantial evidence standard, review is similarly narrow. The Supreme Court has "defined 'substantial evidence' as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Consolo v. Federal Maritime Commission, 383 U.S. 607, 619-20 (1966), quoting Consolidated Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938). Substantial evidence "is something less than

-10-

the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." Consolo, 383 U.S. at 620 (citations omitted).  In applying the substantial evidence standard, the court may not "displace the . . . [Secretary's ] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951).

Given the narrowness of the APA standard of review, the reviewing court may "not substitute its judgment for that of the agency." Lloyd Noland Hosp. and Clinic v. Heckler, 762 F.2d 1561, 1565 (11th Cir. 1985 ); Kirkland v. Railroad Retirement Board, 706 U.S. 99, 103 (2d Cir. 1983).  Rather, the "interpretation of an agency charged with the administration of a statute is entitled to substantial deference." Blum v. Bacon, 457 U. S. 132, 141 (1982).  Because "a presumption of validity [is] accorded to administrative bodies acting within the sphere of their expertise," TNT Tariff Agents, Inc. v. I.C.C., 525 F.2d 1089, 1093 (2d Cir 1975), the courts have repeatedly recognized and articulated the substantial weight and deference to be accorded to agency action reviewable under the APA.

In reviewing the Secretary's construction of a Medicare statute under the familiar standard in Chevron U.S.A., Inc. v. NRDC, 467 U.S. 837, 843 (1984), this Court cannot substitute plaintiffs' opinion for that of the Secretary.  Instead, it must defer to the Secretary's judgment unless the statutory text "unambiguously forbids" his view or his interpretation "exceeds the bounds of the permissible" for other reasons.  Barnhart v. Walton, 535 U.S. 212, 218 (2002).  To meet this test, the Secretary's reading "need not be the only reasonable one," Conn. Dep't of Income Maint. v. Heckler, 471 U.S. 524, 532 (1985), or even "the best or most natural one by grammatical or other standards." Pauley v. BethEnergy Mines, Inc., 501 U.S. 680, 702 (1991).

-11-

Rather, his construction is entitled to controlling weight so long as it falls "within the bounds of reasonable interpretation." Your Home Visiting Nurse Servs., Inc. v. Shalala, 525 U.S. 449, 453 (1999).[2] This deferential test applies with full force when the statutory interpretation at issue appears "in the context of formal adjudication," SEC v. Zandford, 535 U.S. 813, 819-20 (2002), and it applies with particular force where the case involves "a complex and highly technical regulatory program," Wis. Dep't of Health & Family Servs. v. Blumer, 534 U.S. 473, 497 (2002) (citation omitted), such as Medicare.

"When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." Udall v. Tallman, 380 U.S. 1, 16 (1965). The task of a court reviewing the Secretary's reading of his own regulations "is not to decide which among several competing interpretations best serves the regulatory purpose," Thomas Jefferson, 512 U.S. at 512, but rather "the agency's interpretation must be given 'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" Id. (quoting Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945)).

---

[2] See Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1, 21 (2000); Regions Hosp., 522 U.S. at 457; Thomas Jefferson Univ. v. Shalala, 512 U.S. 504, 512 (1994); Good Samaritan Hosp. v. Shalala, 508 U.S. 402, 414 (1993); Rust v. Sullivan, 500 U.S. 173, 184 (1991); Sullivan v. Everhart, 494 U.S. 83, 89 (1990).

## II.    THE MEDICARE STATUTE DOES NOT UNAMBIGUOUSLY REQUIRE THE COUNTING OF THE PATIENT DAYS AT ISSUE IN THIS CASE, WHICH ARE ATTRIBUTABLE TO PATIENTS WHO ARE NOT ELIGIBLE FOR MEDICAID.

Plaintiffs in this case challenge the Secretary's interpretation of the Medicare statute, arguing that the statute unambiguously requires the Secretary to count the patient days at issue in the numerator of the Medicaid fraction of the Medicare DSH calculation.  In Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 US 837, 844 (1984), the Supreme Court "recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer."  The familiar two-prong Chevron analysis governs the Court's inquiry into plaintiffs' claims here.  The first question under Chevron is "whether Congress has directly spoken to the precise question at issue.  If the intent of Congress is clear, that is the end of the matter."  Id. at 842.  If, however, the statute is "silent or ambiguous with respect to the specific issue," the court must proceed to the second prong of Chevron, under which the "question for the court is whether the agency's answer is based on a permissible construction of the statute."  Id. at 843.  See also Holly Sugar Corp. v. Johanns, 437 F.3d 1210, 1213 (D.C. Cir. 2006); County of Los Angeles v. Shalala, 192 F.3d 1005, 1012-1013 (D.C. Cir. 1999).

Under the second prong of Chevron, the "view of the agency charged with administering the statute is entitled to considerable deference; and to sustain it, [the Court] need not find that it is the only permissible construction that [the agency] might have adopted."  Chemical Mfrs. Ass'n v. Natural Resources Defense Council, Inc., 470 U.S. 116, 125 (1985).  Such deference is especially appropriate in cases, such as this one, brought under the Medicare statute, because that statute "is among the most intricate ever drafted by Congress," and Congress accordingly has

-13-

"conferred on the Secretary exceptionally broad authority to prescribe standards" for applying

certain sections of the Act.  Schweiker v. Grey Panthers, 453 U.S. 34, 43 (1981).

> A.    The Secretary's interpretation of the statutory phrase "eligible for medical
> assistance under a State plan" is reasonable and is entitled to deference.

The "precise question at issue" in this case is whether the Medicare statute requires the

Secretary to count, in the numerator of the Medicaid fraction of the Medicare DSH calculation,

patient days of individuals who are not eligible for Medicaid but who receive charity care from

Ohio hospitals as a condition of the hospitals receiving a DSH payment under the Medicaid

program.

The Medicare DSH statute defines the numerator of the Medicaid fraction of the

Medicare DSH calculation as "the number of the hospital's patient days for such period which

consist of patients who (for such days) were eligible for medical assistance under a State plan

approved under title XIX [of the Social Security Act], but who were not entitled to benefits under

part A of [Medicare]."  42 U.S.C. § 1395ww(d)(5)(F)(vi).  Plaintiffs assert that the statutory

language  "clearly and precisely" addresses Ohio HCAP program days, Statement of Points and

Authorities in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' MSJ") at 6, but

the statute does not directly address the factual scenario presented by this case.  The Secretary

has interpreted "eligible for medical assistance under a State plan approved under title XIX" as

meaning eligible for Medicaid.  See 42 C.F.R. § 412.106(b)(4) (1999) (The fiscal intermediary

determines "the number of the hospital's patient days of service for which patients were eligible

for Medicaid but were not entitled to Medicare Part A . . . .").  An individual is eligible for

Medicaid if he or she meets the eligibility criteria and standards set forth in the Medicaid statute

and the applicable Medicaid State plan.

-14-

As stated earlier, the Medicaid statute establishes a number of requirements that must be met in order for a Medicaid State plan to be approved. See generally 42 U.S.C. §§ 1396a(a)(1)-(65). One such requirement is that a State plan must make medical assistance available to certain "categorically needy" persons. Id. § 1396a(10)(A)(i). At the State's option, the plan may also make medical assistance available to "medically needy" persons. Id. § 1396a(a)(10)(C).

The Medicaid statute sets forth a number of requirements, including income and resource limitations, that apply to individuals who wish to receive medical assistance under the State plan. See, e.g., 42 U.S.C. §§ 1396a(a)(10)(A)(i)(IV), (VI), (VII); see also id. § 1396b(f). Individuals who meet the applicable eligibility requirements and limitations are eligible for medical assistance under the State plan, that is, eligible for Medicaid benefits; conversely, individuals who do not meet the applicable eligibility requirements and limitations, either by reason of their income levels or other reasons, are not eligible for medical assistance under the State plan.

Plaintiffs concede that the patient days at issue in this case are attributable to patients who are not eligible for Medicaid. See A.R. at 17. Nevertheless, plaintiffs argue that the Medicare statute unambiguously requires the Secretary to count the patient days at issue. But nothing in the statutory language compels the conclusion that the numerator of the Medicaid fraction of the Medicare DSH calculation must include patient days of patients who are not eligible for Medicaid.[3]

---

[3] Plaintiffs argue that the Court should reject the Secretary's interpretation of "eligible for medical assistance under a State plan approved under Title XIX" as meaning "traditional" Medicaid (to use plaintiffs' terminology). Plaintiffs' MSJ at 14-17. The patients at issue in this case are not eligible for Medicaid benefits; as discussed further below, HCAP is a program which provides Medicaid DSH payments to hospitals, not Medicaid benefits to individuals.

In calculating the numerator of the Medicaid fraction of the Medicare DSH calculation, the Secretary counts patient days of patients who meet the eligibility criteria and standards set forth in the Medicaid statute and the State plan approved under title XIX. This interpretation is entirely consistent with the text of the statute and the statutory scheme, and consequently must be upheld under the deferential standard articulated in Chevron.

> B.    Contrary to plaintiffs' assertions, the statute does not "clearly and precisely" require the inclusion of HCAP days in the numerator of the Medicaid fraction of the Medicare DSH calculation.

In their enthusiasm to have the Court resolve this case at the first step of the Chevron analysis, plaintiffs argue erroneously that the "text of the DSH statute clearly and precisely answers" the question of whether Ohio HCAP days must be included in the numerator of the Medicaid fraction of the Medicare DSH calculation (Plaintiffs' MSJ at 6). To the contrary, the Medicare DSH statute does not mention HCAP at all, let alone clearly and precisely state that HCAP days must be included in the numerator of the Medicaid fraction of the Medicare DSH calculation.

Plaintiffs state, Plaintiffs' MSJ at 7, that if a patient is "eligible for medical assistance under a State plan approved under [title XIX]," the patient days must be included in the numerator of the Medicaid fraction of the Medicare DSH calculation. See 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II). The Secretary does not dispute this proposition. But the question in this case is whether "HCAP days" are patient days of patients eligible for medical assistance under a State plan approved under title XIX. The statute does not directly address that question. The Secretary has reasonably interpreted "eligible for medical assistance under a State plan approved under title XIX" to mean "eligible for Medicaid." The Secretary has also reasonably determined that the statute does not require the numerator of the Medicaid fraction of the

Medicare DSH calculation to include the patient days at issue in this case – patient days
attributable to patients who are not eligible for Medicaid but who receive charity care pursuant to
a program that provides Medicaid DSH payments to hospitals. The Secretary's interpretation of
the statute is entitled to substantial deference and should be upheld.

>       C.      The only federal courts of appeals to have addressed this question have
>               adopted the position that "eligible for medical assistance under a State
>               plan approved under title XIX" means eligible for Medicaid.

Plaintiffs ironically cite a number of cases addressing the numerator of the Medicaid
fraction of the Medicare DSH calculation in support of their argument that the Secretary's
interpretation of that section is unreasonable. Plaintiffs' MSJ at 13. In fact, these cases stand for
the proposition that the phrase "eligible for medical assistance under a State plan approved under
title XIX" refers to individuals who are eligible for Medicaid. See Cabell Huntington Hosp. Inc.,
v. Shalala, 101 F.3d 984 (4th Cir. 1996); Jewish Hospital Inc. v. Sec'y of Health & Human
Servs., 19 F.3d 270 (6th Cir. 1994); Legacy Emanuel Hosp. & Health Ctr. v. Shalala, 97 F.3d
1261 (9th Cir. 1996); Deaconess Health Serv. Corp. v. Shalala, 83 F.3d 1041 (1996). In Jewish
Hospital, the majority opinion stated:

> Looking to the plain language of the statute, the word "eligible" refers to whether
> a patient is capable of receiving federal medical assistance or *Medicaid*. There is
> no indication from the text of the statute that Congress intended to impute any
> special meaning to the term, eligible. Additionally, the phrase, "the number of the
> hospital's patient days for such period," modifies the term eligible. Facially, this
> phrase speaks to the aggregate number of days for which a hospital provides
> *Medicaid eligible services*. Thus, it appears that all days for which an individual
> is capable of receiving *Medicaid* should be figured into the proxy calculation.

19 F.3d at 274 (emphasis added). See also Cabell Huntington, 101 F.3d at 889 ("It is apparent
that 'eligible for medical assistance under a State plan' refers to patients who meet the income,
resource, and status qualifications specified by a particular state's Medicaid plan . . . ."); Legacy

-17-

Emanuel, 97 F.3d at 1264 ("[T]he word 'eligible' refers to whether a patient is capable of receiving . . . Medicaid."); id. at 1265 ("We believe the language of the Medicare reimbursement provision is clear: the Medicaid proxy includes all patient days for which a person was eligible for Medicaid benefits, whether or not Medicaid actually paid for those days of service."). Similarly, the legislative history also supports the Secretary's view that the numerator of the Medicaid fraction of the Medicare DSH calculation is tied to eligibility for Medicaid. See, e.g., H.R. Rep. No. 99-241 at 16 (1986), reprinted in 1986 U.S.C.C.A.N. 579, 594 ("The proxy measure for low-income would be the percentage of a hospital's total patient days attributable to medicaid patients . . . ."). Plaintiffs do not acknowledge this contrary authority, nor can they explain it away.

      D.     The Court should reject plaintiffs' efforts to have the Court substitute plaintiffs' alternative interpretation of the statute for that of the Secretary.

Plaintiffs do not demonstrate, because they cannot, how the Secretary's interpretation of the Medicare DSH statute, 42 U.S.C. § 1395ww(d)(5)(F)(vi)(II), is unreasonable. Instead, plaintiffs offer an alternative interpretation. But the fact that plaintiffs can fashion an alternative interpretation, which they may prefer, is irrelevant. The law is clear that the question is not whether the Secretary's interpretation is the best interpretation, but whether it is permissible. Chevron, 467 U.S. at 843.

      1.     HCAP is a program of providing Medicaid DSH payments to hospitals, not a program of providing Medicaid benefits to individuals.

Even if, contrary to law, plaintiffs merely needed to offer a better interpretation than the Secretary's, plaintiffs' interpretation is clearly incorrect and should be rejected for that reason. Under plaintiffs' theory, the statute unambiguously requires the Secretary to count, in the

-18-

numerator of the Medicaid fraction of the Medicare DSH calculation, patient days of patients who do not meet the eligibility criteria and standards for Medicaid benefits set forth in the Medicaid statute and the State plan approved under title XIX (and thus are not eligible for Medicaid).

Plaintiffs do not argue that individuals who receive charity care pursuant to HCAP meet the eligibility criteria and standards for "traditional" Medicaid benefits (to use plaintiffs' terminology). Instead, plaintiffs argue that charity care provided pursuant to HCAP is (unambiguously) "medical assistance under a State plan approved under title XIX." Plaintiffs' alternative interpretation of the statute is flawed because HCAP is a program of providing Medicaid DSH payments to hospitals, not a program of providing Medicaid benefits to individuals – the fact that the statute requires State plans to provide for Medicaid DSH payments to hospitals is irrelevant to the question whether an individual is eligible for medical assistance under a State plan approved under title XIX.

Plaintiffs argue that in order to be approved by the Secretary, State plans of medical assistance must include a "program to compensate hospitals that serve a disproportionate share of low-income patients." Plaintiffs' MSJ at 8. The Medicaid statute, at 42 U.S.C. § 1396a(a)(13)(A), provides that State plans must take into account the needs of hospitals that serve a disproportionate share of low-income patients ("Medicaid DSH hospitals"). To fulfill this mandate, a State plan must conform with the requirements of 42 U.S.C. § 1396r-4. This section gives States broad discretion in how their plans identify Medicaid DSH hospitals, but also provides certain statutory criteria. 42 U.S.C. § 1396r-4(b)(1) The first of these criteria, a hospital's "Medicaid utilization rate," is based on the percentage of a hospital's patients who are eligible for Medicaid:

> The term "medicaid inpatient utilization rate" means, for a hospital, a fraction (expressed as a percentage), the numerator of which is the hospital's number of inpatient days attributable to patients who (for such days) were eligible for medical assistance under a State plan approved under this title and the denominator of which is the total number of the hospital's inpatient days in that period.

42 U.S.C. § 1396r-4(b)(2).  If a hospital's Medicaid utilization rate is more than one standard deviation above the mean for hospitals in the State receiving Medicaid payments, the hospital is eligible to receive Medicaid DSH payments.  42 U.S.C. § 1396r-4(b)(1)(A).

The second statutorily prescribed way of identifying Medicaid DSH hospitals is quite different.  Instead of identifying Medicaid DSH hospitals by the percentage of Medicaid patients they treat, the statute focuses on the amount of charity care the hospital provides to patients who are not eligible for Medicaid.  This second method involves calculating a "low-income utilization rate," which is a calculation of the percentage of a hospital's charges which are attributable to charity care.  42 U.S.C. § 1396r-4(b)(3)(B).  The statute provides that hospitals with a low-income utilization of more than a 25% rate is a Medicaid DSH hospital.  42 U.S.C. § 1396r-4(b)(1)(B).  Thus, hospitals can qualify as Medicaid DSH hospitals (by statute) according to either the percentage of their patients who are eligible for medical assistance under a state plan approved under title XIX (Medicaid) or the percentage of their patients who receive charity care.

Plaintiffs start with the premise that the Ohio State plan considers whether a hospital provides a certain minimum amount of charity care to patients in making Medicaid DSH payments, and conclude that charity care patients must be counted as "eligible for medical assistance under a State plan approved under title XIX."  Plaintiffs' MSJ at 8.  Plaintiffs' conclusion reflects faulty logic.  By its own terms, the section of the Ohio State plan related to HCAP sets forth requirements for the "eligibility" of hospitals to receive Medicaid DSH

-20-

payments; HCAP does not set forth criteria, standards, requirements, and limitations for eligibility of <u>individuals</u> to qualify for Medicaid benefits under the State plan. As stated earlier, plaintiffs concede that the charity care patients at issue are not eligible for Medicaid. A.R. at 17.

The only connection that the charity care patients at issue have to the Medicaid State plan is that they receive free medical care as a condition of hospitals receiving a Medicaid DSH payment. But this connection does not make them "eligible" for medical assistance under the State plan. In fact, as discussed above, the Medicaid statute explicitly contemplates that a hospital's qualification for a Medicaid DSH payment may be based in part on the amount of charity care a hospital provides to patients who are <u>not</u> eligible for medical assistance under the State plan approved under title XIX. <u>See</u> 42 U.S.C. § 1396r-4(b)(1); 42 U.S.C. § 1396r-4(g)(1)(A). Plaintiffs argue that the statutory language "eligible for medical assistance under a State plan approved under title XIX" unambiguously includes patients who are not eligible for Medicaid but who receive charity care pursuant to a program of providing Medicaid DSH payments to hospitals. The Court should reject plaintiffs' efforts to have the Court substitute plaintiffs' interpretation for that of the Secretary.

    2. By definition, individuals who receive charity care pursuant to HCAP are not eligible for medical assistance under the State plan approved under title XIX.

In order to qualify for charity care pursuant to HCAP, the individuals at issue <u>cannot</u> be eligible for medical assistance under the State plan approved under title XIX. <u>See</u> A.R. at 12. Section 5112.17(B) of the Ohio Revised State code explicitly states that hospitals receiving Medicaid DSH payments must provide a minimal amount of care free of charge to patients who "are not recipients of the medical assistance program, and whose income is at or below the federal poverty guidelines." <u>Id.</u> Section 5111.01 of the Ohio Revised State Code, in turn,

defines "medical assistance program" or "medicaid" as "the program that is authorized by this chapter and provided by the department of job and family services under this chapter, Title XIX of the 'Social Security Act' 79 Stat. 286 (1965), 42 U.S.C.A. § 1396, as amended, and the waivers of Title XIX requirements granted to the department by the health care financing administration of the United States department of health and human services."

This distinction between a patient's eligibility for medical assistance under a State plan approved under title XIX and a hospital's "eligibility" for a Medicaid DSH payment was key to the decision of the CMS Administrator, which reversed the decision of the PRRB. See A.R. 11-13. In the Summary of Comments in the Administrator's decision, the Administrator discussed Program Memorandum A-99-62, which makes this distinction explicit:

> Sometimes Medicaid State Plans specify Medicaid payments are based upon a hospital's amount of charity care or general assistance days. This, however, is not "payment" for those days and does not mean that the patient is eligible for Medicaid benefits or can be counted as such in the Medicare formula.

A.R. at 4. The CMS Administrator held that whether or not HCAP days were used in calculating the Medicaid DSH payment was ultimately irrelevant to whether or not the days were of patients eligible for medical assistance because the payment was not for those days. A.R. at 13.

As reflected in the Ohio State Code and the decision of the CMS Administrator, individuals who receive charity care pursuant to HCAP are by definition not eligible for medical assistance under the State plan approved under title XIX. Plaintiffs attempt to escape this inherent (and fatal) flaw in their position by offering an alternative interpretation of "eligible for medical assistance under a State plan approved under title XIX." According to plaintiffs, HCAP is a "program of" medical assistance (as defined by plaintiffs) approved under title XIX of the Social Security Act. Plaintiffs' MSJ at 6. Plaintiffs argue that, because HCAP is allegedly a

-22-

"program of" medical assistance, the patient days at issue must be included in the numerator of the Medicaid fraction of the Medicare DSH calculation. But the Secretary has reasonably interpreted "eligible for medical assistance under a State plan approved under title XIX" to mean eligible for Medicaid benefits, and the Secretary's interpretation is entitled to deference, as is the decision of the CMS Administrator. A.R. 2-14.

Plaintiffs argue that the Court should reject the Secretary's interpretation that "eligible for medical assistance under a State plan approved under title XIX" means "eligible for Medicaid" (or, to use plaintiffs' terminology, eligible for "traditional" Medicaid). Plaintiffs' MSJ at 14-17. None of plaintiffs' arguments compel the conclusion that the Secretary's interpretation is precluded by the statute.

As an initial matter, plaintiffs state: "According to the Secretary, the words 'medical assistance' should be separated from the phrase 'medical assistance under a State plan approved under title XIX . . . .'" Plaintiffs' MSJ at 14. This assertion is patently incorrect. Under the Secretary's interpretation, "eligible for medical assistance under a State plan approved under title XIX" means eligible for Medicaid – that is, the phrase "medical assistance under a State plan approved under title XIX" means Medicaid benefits.

Plaintiffs then go on to distort the issue in this case by stating that the statute "clearly focuses on whether services were provided (and expenditures made) **under a state plan approved under title XIX**." Plaintiffs' MSJ at 14 (bold in original). This mischaracterization of the statute ignores the concepts of eligibility and medical assistance.

Plaintiffs argue that the Court should reject the Secretary's interpretation of "medical assistance" and urge the Court to substitute plaintiffs' interpretation for that of the Secretary. But it is plaintiffs' interpretation that is contrary to the statute. While plaintiffs correctly state that 42

U.S.C. § 1396d(a) defines "medical assistance" as "payment of part or all of the cost" of care and services, the statute also specifies in subsections (a)(i)-(xiii) to whom a State plan may offer medical assistance. A person who does not qualify under one of the categories in § 1396d(a)(i)-(xiii) cannot be made eligible for "medical assistance" (under the approved State plan) as the term is defined in title XIX. Looking at the provisions of the Ohio State Plan which plaintiffs offer, it appears that HCAP sets forth only three requirements for receiving charity care: (1) that the patient not be eligible for Medicaid; (2) that the patient be at or below the federal poverty line; and (3) that the patient be an Ohio resident. A.R. at 787, 794. According to plaintiffs' theory, all individuals who meet the criteria for receiving charity care pursuant to HCAP would be eligible for "medical assistance" under the Ohio State plan, even if they clearly fall outside one of the 13 enumerated optional categories set forth in section 1396a(d) or were otherwise expressly excluded from eligibility by some other provision of the statute. This is simply wrong. For example, 42 U.S.C. § 1396b(v) prohibits payment to any state for "medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." Id. Under plaintiffs' theory, an unlawful alien resident of the state of Ohio, below the poverty line, would be eligible for "medical assistance under the State plan approved under title XIX" by virtue of receiving charity care pursuant to HCAP despite the clear prohibition in title XIX regarding unlawful aliens. Indeed, there are potentially numerous references in the payment provisions of numerous state plans to individuals whom the Secretary would not, and could not, approve as eligible for "medical assistance under the State plan." [4]

--------

[4] Plaintiffs' argument is particularly troubling because, if the Court were to hold that the patients at issue were eligible for medical assistance under their respective State plans, the

    E.     Plaintiffs' reliance on court decisions addressing Medicare DSH is <u>misguided.</u>

Plaintiffs argue that the Secretary's decision is not entitled to deference because of a purported "hostility" toward the DSH payment.  Plaintiffs' MSJ at 13.  As an initial matter, the D.C. Circuit has stated explicitly that <u>Chevron</u> deference applies notwithstanding any such alleged hostility.  <u>See</u> <u>North Broward Hosp. Dist. v. Shalala</u>, 172 F.3d 90, 94 (D.C. Cir. 1999).  Plaintiffs contend, without support, that the Secretary's decision not to include charity care days arises from the Secretary's "hostility" toward the Medicare DSH payment.  Plaintiffs have to rely upon such ad hominem attacks to divert the Court from the central weakness of their argument: it is fundamentally reasonable for the Secretary to exclude patients, which according to the Ohio State plan's own terms, are not eligible for Medicaid, from the count of patients "eligible for medical assistance under a State plan approved under title XIX."  There is nothing hostile about this position.  Moreover, the fact that the Secretary's interpretation of the law may have been rejected by earlier courts does not mean that his interpretation on a separate, although related, question is not entitled to the standard of review articulated by the Supreme Court in <u>Chevron</u>. <u>North Broward Hosp. Dist.</u>, 172 F.3d at 94.

Similarly, plaintiffs' reliance on the Ninth Circuit's decision in <u>Portland Adventist Medical Center v. Thompson</u>, 399 F.3d 1091 (9th Cir. 2005) is misguided.  In <u>Portland Adventist</u>, the court addressed the question of whether patient days of patients who were eligible for

---

Secretary would reevaluate whether those plans complied with the various provisions of title XIX that restrict who can be made eligible under a State plan, the services that can be regarded as medical assistance, or provide substantive rights to those patients that are. <u>See</u> <u>e.g.</u>, 42 U.S.C. §§ 1396a(a)(10); 1396d(a)(i-xiii) and 1903(v)(restricting categories of eligible individuals and services for certain groups); 42 U.S.C. §§ 1396a(a)(7), (8), (23), (26), (34), and (43) (beneficiary protections).

medical assistance under a demonstration project approved under section 1115 of the Social

Security Act ("section 1115 expansion populations") must be included in the numerator of the

Medicaid fraction of the Medicare DSH calculation.  The Ninth Circuit held that section 1115

expansion populations were eligible for medical assistance under the State plan and therefore

held that the Secretary's pre-January 2000 policy of not counting them conflicted with the

language of 42 U.S.C. § 1395ww(d)(5)(F)(i)(II).  In reaching this conclusion, the court

specifically relied upon language in section 1115 of the Social Security Act (42 U.S.C. § 1315)

which is specifically *not* applicable here.  Ohio's charity care population is not a demonstration

project approved under section 1115 and <u>Portland Adventist</u> is simply inapposite in this case.

In any event, Congress has expressly provided that the 9th Circuit's view that section

1115 expansion populations are eligible for medical assistance under a State plan approved under

title XIX (and thus must be included in the numerator of the Medicaid fraction of the Medicare

DSH calculation) is wrong.  Specifically, Congress clarified the law by amending 42 U.S.C. §

1395ww(d)(5)(F)(vi)(II) in the Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 5002, 120

Stat. 4, * (2006) ("DRA").  In pertinent part, the DRA states:

> SEC. 5002. CLARIFICATION OF DETERMINATION OF MEDICAID PATIENT
> DAYS FOR DSH COMPUTATION.
>
> (a) IN GENERAL- Section 1886(d)(5)(F)(vi) of the Social Security Act (42 U.S.C.
> 1395ww(d)(5)(F)(vi)) is amended by adding after and below subclause (II) the following:
>
>> `In determining under subclause (II) the number of the hospital's patient days for
>> such period which consist of patients who (for such days) were eligible for
>> medical assistance under a State plan approved under title XIX, the Secretary
>> may, to the extent and for the period the Secretary determines appropriate, include
>> patient days of patients not so eligible but who are regarded as such because they
>> receive benefits under a demonstration project approved under title XI.'.
>
> (b) RATIFICATION AND PROSPECTIVE APPLICATION OF PREVIOUS
> REGULATIONS-

(1) IN GENERAL- Subject to paragraph (2), regulations described in paragraph (3), insofar as such regulations provide for the treatment of individuals eligible for medical assistance under a demonstration project approved under title XI of the Social Security Act under section 1886(d)(5)(F)(vi) of such Act, are hereby ratified, effective as of the date of their respective promulgations.

(2) NO APPLICATION TO CLOSED COST REPORTS- Paragraph (1) shall not be applied in a manner that requires the reopening of any cost reports which are closed as of the date of the enactment of this Act.

(3) REGULATIONS DESCRIBED- For purposes of paragraph (1), the regulations described in this paragraph are as follows:

(A) 2000 REGULATION- Regulations promulgated on January 20, 2000, at 65 Federal Register 3136 et seq., including the policy in such regulations regarding discharges occurring prior to January 20, 2000.

(B) 2003 REGULATION- Regulations promulgated on August 1, 2003, at 68 Federal Register 45345 et seq.

Thus, section 5002 of the DRA unequivocally states that section 1115 expansion populations are not eligible for medical assistance under a State plan, and it ratifies the regulations relating to the Secretary's treatment of section 1115 expansion populations for purposes of the Medicare DSH calculation. Congress has, therefore, expressly ratified the regulations and policies relating to the Secretary's treatment of section 1115 expansion populations for the purpose of the DSH calculation. Pub. L. No. 109-171, § 5002, 120 Stat. 4, * (2006). This court should place no weight on a decision of a Court of Appeals which, in the first instance is not applicable to the facts of this case, and which was specifically disavowed by Congress through a statutory clarification.

      F.      Plaintiffs' reliance on administrative decisions that were subsequently reversed is also misguided.

Plaintiffs also rely, Plaintiffs' MSJ at 11, on the decision of the Provider Reimbursement Review Board ("PRRB") in both this case and Jersey Shore Medical Center v. Blue Cross and

<u>Blue Shield Association</u>, PRRB Case No. 95-0907), but they fail entirely to address the reasoning which led the CMS Administrator to reverse the PRRB's decisions in either case. In this case, the decision of the CMS Administrator was that "the days at issue are related to individuals that are specifically identified as not eligible for medical assistance under an approved Title XIX State plan." A.R. at 12. Similarly, while plaintiffs note in passing that the CMS Administrator did not affirm the PRRB's decision in <u>Jersey Shore</u>, Plaintiffs' MSJ at 12, they do not explain that the CMS Administrator remanded that case back to the PRRB for further factual development. Specifically, the CMS Administrator found that the record in <u>Jersey Shore</u> did not adequately demonstrate whether the New Jersey State Medicaid plan actually paid for the care of the patients at issue in that case, or whether they were merely (as is the case here) counted in determining a hospital's eligibility for a Medicaid DSH payment. Exhibit 1 at 4. In both cases, the CMS Administrator correctly identified the fact that any connection between the patient days at issue and Medicaid DSH payments was a red herring. <u>Id.</u> at 4; A.R. at 13. The PRRB decisions in this case and in <u>Jersey Shore</u> do not compel the conclusion that the statute unambiguously requires the Secretary to count, in the numerator of the Medicaid fraction of the Medicare DSH calculation, patient days of patients who receive charity care pursuant to HCAP and who, by definition, are not eligible for medical assistance under the State plan approved under title XIX.

## CONCLUSION

For the foregoing reasons, the Secretary's exclusion of the patient days at issue in this case reflects a reasonable interpretation of the Medicare statute and should be upheld under the deferential Chevron standard.  Accordingly, the defendant respectfully requests that the Court grant defendant's motion for summary judgment and dismiss plaintiffs' complaint with prejudice.[5]

Respectfully submitted,


_____/s/_____
KENNETH L. WAINSTEIN
United States Attorney
D.C. Bar No. 451058


_____/s/_____
MEGAN L. ROSE
Assistant United States Attorney
N.C. Bar No. 28639
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
(202) 514-7220 / FAX: (202) 514-8780


_____
DAVID HOSKINS
U.S. Department of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
330 Independence Ave., S.W., Room 5309
Washington, D.C. 20201

_____

[5]  In the event that the Court were to grant plaintiffs' motion for summary judgment and deny Defendant's motion for summary judgment, the proper course of action would be for the Court to remand the matter to the agency.  Plaintiffs' request for relief, Complaint at 11-12, is inappropriate.

OF COUNSEL:

PAULA M. STANNARD
Acting General Counsel

KATHLEEN H. MCGUAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of Health
and Human Services